United States Court of Appeals,

Fifth Circuit.

No. 92-5123.

FEDERAL DEPOSIT INSURANCE CORPORATION, in its Corporate Capacity, Plaintiff-Appellee, Cross-Appellant,

v.

Gus S. MIJALIS, et al., Defendants,

and

Gus S. Mijalis, et al., Defendants-Appellants, Cross-Appellees.

March 10, 1994.

Appeals from the United States District Court for the Western District of Louisiana.

Before REYNALDO G. GARZA, KING and DeMOSS, Circuit Judges.

KING, Circuit Judge:

After a jury trial, the United States District Court for the Western District of Louisiana entered judgment in favor of the plaintiff, the Federal Deposit Insurance Corporation (FDIC), and against Gus S. Mijalis, Alex S. Mijalis, John G. Cosse, John B. Franklin, and J. Harper Cox, Jr. (the individual defendants), and their directors' and officers' liability insurer, International Insurance Company. We now consider the defendants' appeals and the FDIC's cross-appeal.

## I. BACKGROUND

### A. FACTS

The stipulations contained in the pretrial order and the evidence introduced at trial, viewed in the light most favorable to the jury verdict, tended to show the following chain of events.

1

The Bank of Commerce (the Bank) was chartered as a Louisiana state bank and opened for business in January 1975. Gus Mijalis served as vice-chairman of the Bank's board of directors from the Bank's opening until May 1980, when he was elected chairman of the board. Gus Mijalis's brother, Alex Mijalis, and his cousin, John Cosse, also served as directors of the Bank from at least 1981 to 1985. Together, these three men owned a controlling bloc of Bank stock, eventually growing to over 657 of outstanding shares by November 1982. J. Harper Cox, Jr., was Bank president from 1976 to 1986, except for a hiatus from June 1981 to July 1982, during which he served as president of AMI, Inc. John Franklin served as a vice-president and loan officer of the Bank from April 1982 to October 1985.

International Insurance Company (International) issued two director and officer liability policies (D & O policies) to the Bank. International issued the first D & O policy (the 1983 policy) to the Bank on February 25, 1981, and it was to run until February 21, 1984; the policy was later amended to expire on January 1, 1984. Originally the 1983 policy's limit of liability was $5 million for each policy year, but in September 1982 International agreed to double the limit to $10 million per policy year. Bank president Cox represented to International that he was aware of no facts that would give rise to any claim in excess of $5 million at the time. In December 1983, the Bank applied for a new D & O policy from International, and International issued a new policy for the period January 1, 1984, to January 1, 1985 (the 1984

policy). This policy reduced coverage to $5 million, and it excluded from coverage several liabilities that were not excluded under the 1983 policy. International declined to renew the 1984 policy after it expired.

The Bank experienced severe financial difficulties during the 1980s. As a federally insured financial institution, the Bank was subject to federal regulation, and a federal examination report noted that the Bank had a negative liquidity as of January 1981. That year the FDIC designated the Bank as a "problem bank," a distinction it shared with only one other bank in its entire 115-bank district. In March 1981, the FDIC entered into a memorandum of understanding with the Bank, establishing performance benchmarks for the Bank intended to improve its liquidity difficulties and its generally unsound financial condition. Matters did not improve, however, and the Bank received a poor rating on its December 1982 examination by the FDIC. In June 1983, the FDIC issued a notice of charges and a proposed cease and desist order, and the FDIC entered the order against the Bank in October 1983.

The Bank's financial condition did not improve, and the FDIC gave the Bank another poor rating in its December 1983 examination. Indeed, between the entry of the memorandum of understanding in March 1981 and June 1984, federal and state regulators advised the Bank on sixteen separate occasions that corrective measures were needed to improve the Bank's financial health. By January 1985, the FDIC downgraded the Bank's financial condition to the poorest rating possible. That year the FDIC issued a more stringent cease

3

and desist order against the Bank, and the FDIC also entered an order prohibiting Gus Mijalis from ever acting as a director or officer of a federally-insured bank.

Finally, on June 13, 1986, the Commissioner of the Louisiana Office of Financial Institutions declared the Bank insolvent and appointed the FDIC as receiver. The FDIC as receiver transferred all of the Bank's claims thereby received to the FDIC in its corporate capacity.

### B. PROCEDURAL HISTORY

The FDIC brought suit in June 1989 in federal district court against numerous Bank directors and officers and against their liability insurers, International and Southern Underwriters, Inc., and the Bank's insurance broker, Morris, Temple & Trent, Inc. Federal subject-matter jurisdiction was predicated on 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (actions brought by the United States or its agencies). The insurance companies were joined under Louisiana's direct action statute. LA.REV.STAT.ANN. § 22:655 (West Supp.1993). Southern Underwriters and Morris, Temple & Trent settled with the FDIC several months prior to trial, and most of the officers and directors of the Bank settled with the FDIC on the eve of trial, leaving as defendants Gus and Alex Mijalis, John Cosse, J. Harper Cox, John Franklin, and International. The FDIC's claims against the defendant directors and officers included breach of fiduciary duty, breach of contract, and negligence, and its claims were based largely on the approval and funding of imprudent loans that ultimately caused substantial

4

losses to the Bank and the FDIC.

Jury trial commenced on November 5, 1991.  On December 12, 1991, the jury returned a verdict in favor of the FDIC for the entire amount of damages sought, some $28.5 million.  The jury further found that some $17.5 million of the total damages suffered by the Bank were attributable to occurrences during the effective period of the 1983 policy.  The district court reserved most of the insurance coverage issues for its own decision, and on June 30, 1992, the court ruled that losses suffered by the Bank traceable to acts or omissions occurring during the years 1981-83 were covered by the 1983 policy.  The court also held that an exclusion in the 1984 policy precluded any coverage of losses stemming from occurrences during that policy's lifetime.  800 F.Supp. 397.  On September 1, 1992, the district court entered judgment in favor of the FDIC in the following amounts (excluding prejudgment and postjudgment interest):  (1) $20,977,918 against Gus and Alex Mijalis, Cosse, Cox, and Franklin *in solido,* (2) $5,302,025 against Gus and Alex Mijalis, Cosse, and Cox *in solido,* and (3) $2,180,931 against Gus and Alex Mijalis and Cosse *in solido.*  The court also adjudged International liable for $17,504,946 of the preceding amounts, plus prejudgment and postjudgment interest.

The defendants' motions for new trial and for judgment as a matter of law were denied.  Appeal to this court followed.[1]

---

[1]We granted leave to American Casualty Company of Reading, Pa. (American Casualty), to file an amicus brief in support of International's position with respect to the insurance coverage issues presented in this case.

5

## C. ISSUES

The issues presented for our consideration may be divided into two general categories. The first category includes the individual defendants' challenges to the merits of the verdict and judgment holding them liable for $28.5 million. Five of the issues raised by the individual defendants in this connection concern the district court's jury instructions, and the sixth issue challenges the district court's refusal to allow the defendants to introduce evidence to show that the FDIC was the proximate cause of all or part of the damages claimed. The FDIC argues in support of the verdict and judgment against the individual directors.

The second category of issues concerns the district court's rulings with respect to insurance coverage. International makes several arguments that the district court erred in holding International liable for $17.5 million of the total judgment. The individual defendants and the FDIC defend this portion of the judgment, and they additionally argue that the district court erred in holding that the 1984 policy provided no coverage for losses during its lifetime.

## II. STANDARDS OF REVIEW

In *Bender v. Brumley,* 1 F.3d 271, 276-77 (5th Cir.1993), we set forth a two-part test for challenges to jury instructions. First, the challenger must demonstrate that the charge as a whole creates "substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *Id.* at 276 (citations omitted). Second, even if the jury instructions were erroneous, we

will not reverse if we determine, based upon the entire record, that the challenged instruction could not have affected the outcome of the case. *Id.* at 276-77. If a party wishes to complain on appeal of the district court's refusal to give a proffered instruction, that party must show as a threshold matter that the proposed instruction correctly stated the law. *Treadaway v. Societe Anonyme Louis-Dreyfus,* 894 F.2d 161, 167 (5th Cir.1990). In sum, "[g]reat latitude is shown the trial court regarding jury instructions." *FDIC v. Wheat,* 970 F.2d 124, 130 (5th Cir.1992).

The individual defendants also complain of the district court's exclusion of certain evidence. We will not reverse a district court's evidentiary rulings unless they are erroneous and substantial prejudice results. The burden of proving substantial prejudice lies with the party asserting error. *Smith v. Wal-Mart Stores (No. 471),* 891 F.2d 1177, 1180 (5th Cir.1990).

With respect to the insurance coverage issues, we note that we review a district court's interpretation of an insurance policy de novo. *Harbor Ins. Co. v. Urban Constr. Co.,* 990 F.2d 195, 199 (5th Cir.1993). Of course, any factual findings made by the district court are reviewed under the clearly erroneous standard. *Prudhomme v. Tenneco Oil Co.,* 955 F.2d 390, 392 (5th Cir.), *cert. denied,* --- U.S. ----, 113 S.Ct. 84, 121 L.Ed.2d 48 (1992).

### III. MERITS ISSUES

We turn our attention first to the issues raised by the individual defendants challenging the judgment entered against them by the district court. Most of their challenges concern the

7

district court's instructions to the jury. The individual defendants also argue that the district court erred by refusing to allow the defendants to introduce evidence in order to prove that they did not cause all or part of the losses that accrued after the Bank was closed.

## A. JURY INSTRUCTIONS

### 1. *Definition of "Gross Negligence"*

The district court concluded that the appropriate legal standard of care in this case was gross negligence, and the parties have not challenged this conclusion as erroneous on this appeal. As the court below observed, federal law provides for personal liability on the part of directors and officers of insured depository institutions for "gross negligence, including any similar conduct or conduct that demonstrates a greater disregard of a duty of care (than gross negligence) including intentional tortious conduct, as such terms are defined and determined under applicable State law." 12 U.S.C. § 1821(k). The defendants, however, argue that the jury instructions given by the district court misstated the definition of gross negligence under Louisiana law, leading to a misunderstanding of the law by the jury and clear prejudice to the defendants' rights. The FDIC responds that the definition given by the district court was correct. We accord substantial deference to the district court's decisions with respect to jury instructions. *See Bender,* 1 F.3d at 276-77.

The individual defendants specifically complain of jury instruction no. 19, which reads as follows:

8

Simple negligence alone is insufficient for a finding of personal liability of the director and officer defendants. Gross negligence is required.

Simple negligence is the failure to act as a reasonably prudent person would act under the circumstances. Gross negligence lies somewhere between simple negligence and willful misconduct or fraud with intent to deceive.

The individual defendants contend that this instruction falls far short of defining the degree of culpability encompassed by the gross negligence standard.

The district court refused to give the defendants' proposed jury instruction, over the defendants' written objections. The proposed jury instruction reads as follows:

The first requirement is that the defendants were grossly negligent in funding each of the sixteen (16) loans particularly alleged.

In order to find that a director is liable, you must determine that he has acted with gross negligence. Simple negligence alone is insufficient for a finding of personal liability of an officer or director of a bank. Gross negligence is the want of even slight care and diligence. It is the want of the diligence of even careless men are accustomed [sic]. Gross negligence is the entire absence of care, and it consists of other disregard of the dictates of prudence amounting to complete neglect of the rights of others. Gross negligence is the entire want of care which would raise the belief that the act or omission complained of was the result of conscious indifference to the right or welfare of the bank. The plaintiffs [sic] must show that the defendants were consciously, that is, knowingly, indifferent to the obligations that they owed the bank. In other words, the plaintiff must show that the defendants knew about the peril of the decisions that they were making, that their acts or omissions demonstrated that they did not care. Errors of judgment in the business world do not necessarily indicate gross misconduct by the management compensable in damages.

We focus first on the threshold issue of whether this prolix proposed instruction accurately stated Louisiana law, which all parties agree we must look to as the source of the appropriate

9

definition of gross negligence. The FDIC cites our decisions in *Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233 (5th Cir.1988), *reh'g denied,* 864 F.2d 1147 (5th Cir.1989) [hereinafter *LWE* ], in opposition to the defendants' definition and in support of the district court's definition. In *LWE* we considered a host of issues arising out of the bankruptcy of Louisiana World Exposition, Inc., a Louisiana nonprofit corporation. *Id.* at 235. We concluded, *inter alia,* that the nonprofit corporation could maintain an action against its officers and directors under Louisiana law for gross negligence, mismanagement, and breach of fiduciary duty. *Id.* at 239. In the course of denying the appellees' petition for rehearing, we further held that Louisiana does not recognize a cause of action against principals of a nonprofit corporation for simple negligence. *Louisiana World Exposition v. Federal Ins. Co.,* 864 F.2d 1147, 1152 (5th Cir.1989). We note that the Louisiana legislature has, since the trial in the instant case, passed a statute limiting personal liability of bank directors and officers to their bank to cases of gross negligence. LA.REV.STAT.ANN. § 6:291(B) (West Supp.1993) (effective July 2, 1992).

Our opinions in *LWE,* however, stop short of giving an actual definition of the gross negligence standard of care. This is hardly surprising because there is a paucity of Louisiana authority on the subject of gross negligence; indeed, it has been observed that gradations of non-intentional fault were almost unknown to Louisiana jurisprudence until very recently. *See* Edwin H. Byrd,

10

III, Comment, *Reflections on Willful, Wanton, Reckless, and Gross Negligence,* 48 LA.L.REV. 1383, 1385 & n. 9 (1988) ("Plaintiffs have frequently alleged "gross negligence' in their complaints even though the exclusive delictual remedy under Louisiana law has, until recently, been based upon ordinary negligence."). The closest we came in *LWE* to offering a definition came in our denial of rehearing when we simply described the standard as lying "somewhere between simple negligence and willful misconduct or fraud with intent to deceive." *LWE,* 864 F.2d at 1150. The district court relied on this description in formulating the definition of gross negligence that it gave the jury in the instant case.

The individual defendants first direct our attention to the statutory definition of gross negligence that now applies to bank directors and officers under LA.REV.STAT.ANN. § 6:291(B). According to the statutory definition, gross negligence is "a reckless disregard of, or a carelessness amounting to indifference to, the best interests of the corporation or the shareholders thereof, and involves a substantial deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances." LA.REV.STAT.ANN. § 6:2(8) (West Supp.1993) (effective July 2, 1992). As noted, this statutory definition did not become effective until after the conclusion of the trial in this matter. Certainly it was not erroneous for the district court to fail to use a definition not yet adopted by the state of Louisiana as law. In any event, this definition was not a part of

11

the instruction tendered to the district court by the defendants.

The defendants also cite the case of *State v. Vinzant,* 200 La. 301, 7 So.2d 917, 922 (1942), for the following proposition:  " "Gross negligence is the want of even slight care and diligence.' It is the "want of that diligence which even careless men are accustomed to exercise.' "  The FDIC counters that *Vinzant* involved the interpretation of Louisiana's involuntary vehicular homicide statute, which prohibited the operation of a motor vehicle in a grossly negligent or grossly reckless manner, *id.,* 7 So.2d at 920, and it insists that this standard was inapposite to corporate directors and officers, whose conduct has always been governed by other Louisiana statutes.  We note that a Louisiana intermediate appellate court has favorably cited the *Vinzant* standard in the civil context (in a medical malpractice case), although this case was admittedly decided after the trial in the instant case. *Ambrose v. New Orleans Police Dep't Ambulance Serv.,* 627 So.2d 233, 243 (La.Ct.App.1993).  Assuming that the defendants had tendered the *Vinzant* definition alone as a jury instruction, the district court might have erred had it rejected the instruction as inapplicable to the corporate director context.

As it happens, however, the defendants did not tender an instruction based on *Vinzant* or other Louisiana law alone. Instead, the proposed instruction cobbles together numerous legal standards from a variety of sources.  The defendants incorporated into the instruction not only the *Vinzant* definition, but also a

12

definition from an admiralty case from federal district court[2] and a case from this court interpreting Texas law.[3] We find no support for the defendant's assertion that Louisiana's gross negligence law was the same as that of Texas, even prior to the statutory definition recently enacted by the Louisiana legislature. Whatever the flaw may have been in using as a jury instruction a description of gross negligence when a definition was in order, the defendants are effectively estopped from complaining because the definition they tendered was itself infirmed. We cannot say that the district court abused its substantial discretion in rejecting it.

## 2. *Comparative Negligence*

The individual defendants next contend that the district court committed reversible error by denying their request for an instruction on the law of comparative negligence. The FDIC makes several responses to this argument, including that (1) the defendants did not offer sufficient evidence that other parties were partially responsible for the Bank's losses to warrant a comparative negligence instruction, (2) federal law controls and would permit the individual defendants only a *pro tanto* reduction in liability even if they had proved that other parties were partially liable for the losses, and (3) even if Louisiana law does

---

[2]*Hendry Corp. v. Aircraft Rescue Vessels,* 113 F.Supp. 198, 201 (E.D.La.1953). It may be noted that the *Hendry* court in turn relied on our opinion in *Hollander v. Davis,* 120 F.2d 131 (5th Cir.1941), a diversity case controlled by Florida law.

[3]*City Nat'l Bank v. United States,* 907 F.2d 536, 541 (5th Cir.1990) (citing *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 920, 922 (Tex.1981)).

13

apply, it would not permit application of comparative negligence principles in this case.

The individual defendants' argument is based on the following facts. On November 4, 1991, the district court was apprised of the fact that the FDIC had reached a settlement with seven persons who apparently had served on the Bank's board of directors between 1981 and 1985. Those settling defendants were apparently dismissed from the case, as the final judgment does not refer to them. The individual defendants tendered the following proposed jury instruction to the district court near the end of trial:

> The gross damages should be reduced by any loss attributable to any factor other than the gross negligence of the directors. Further, the loss should be reduced by any loss attributable to any of the alleged acts of gross negligence of any defendants who approved these loans but served on either of the loan committees and the board of directors.

> During this tenure, other individuals served on the board of directors of the bank and the loan committees. If you determine that these individuals were involved in the same acts and omissions, then you will be required to determine what percent of any of the losses involved in this lawsuit should be allocated to these defendants.

The district court rejected this proposed instruction and did not give the jury an interrogatory to permit it to assign a percentage of fault to parties other than the individual defendants. The court noted that there was no evidence before the jury regarding any of the parties that settled before trial.

The facts of this case are strikingly similar to those presented in *FDIC v. Mmahat,* 907 F.2d 546 (5th Cir.1990), *cert. denied,* 499 U.S. 936, 111 S.Ct. 1387, 113 L.Ed.2d 444 (1991). *Mmahat* involved a legal malpractice action by the FDIC against John

14

Mmahat, general counsel for a federally-chartered savings and loan that went into receivership. *Id.* at 549. The FDIC sued Mmahat for advising the savings and loan to make loans in violation of regulations promulgated by the Federal Home Loan Bank Board. *Id.* As in the instant case, several officers and directors settled with the FDIC before trial, but no jury interrogatory regarding their proportionate fault was given. *Id.* at 550. Mmahat argued that the Louisiana proportionate reduction rule should have applied to reduce his liability by the percentage of fault attributed to settling parties. *Id.* The FDIC argued, as it does in the instant case, that we should apply a uniform federal common law rule to determine the effect of the partial settlement, and it further argued that we should adopt the *pro tanto* rule, which limits nonsettling defendants to receiving a dollar-for-dollar credit for any amount paid by settling defendants. *Id.* The *Mmahat* court refused to decide the issue because there was no evidence of the settling defendants' fault on which to predicate a comparative negligence instruction, even assuming that use of the proportionate reduction rule would have been appropriate. *Id.*

The legal effect of a partial settlement in FDIC litigation of this type has not been definitively resolved in any of the federal courts of appeals. The Tenth Circuit has recognized that the establishment of a special *pro tanto* rule for the FDIC would present "some very difficult legal questions." *FDIC v. Geldermann, Inc.,* 975 F.2d 695, 699-700 (10th Cir.1992) (expressing no opinion on the appropriate legal standard for calculating the setoff for a

15

related settlement). The district courts have debated the merits of the proportionate reduction and the *pro tanto* rules in the context of FDIC litigation, with mixed results. *Compare FDIC v. Deloitte & Touche,* 834 F.Supp. 1155 (E.D.Ark.1993) (applying the proportionate reduction rule) *and Resolution Trust Corp. v. Gallagher,* 815 F.Supp. 1107 (N.D.Ill.1993) (same) *with Resolution Trust Corp. v. Platt,* No. 92-CV-277-WDS (S.D.Ill. Aug. 24, 1993) (unpublished opinion) (applying the *pro tanto* rule) *and FSLIC v. McGinnis, Juban, Bevan, Mullins & Patterson, P.C.,* 808 F.Supp. 1263 (E.D.La.1992) (same).

We need not resolve these difficult issues because, as in *Mmahat,* the individual defendants in the instant case would have had the burden at trial of proving the settlors' share of fault even under the proportionate reduction rule. *Mmahat,* 907 F.2d at 550. Just as in *Mmahat,* the court below found that there was insufficient evidence in the record to permit a finding of proportionate fault. It is well-established that a district court should not instruct the jury on a proposition of law if there is no competent evidence to which it may be applied. *See Concise Oil & Gas Partnership v. Louisiana Intrastate Gas Corp.,* 986 F.2d 1463, 1474 (5th Cir.1993); *DMI, Inc. v. Deere & Co.,* 802 F.2d 421, 429 (Fed.Cir.1986). We agree with the FDIC that the individual defendants did no more than introduce evidence to show that some of the settling defendants sat on the Bank's board of directors and/or loan committee at times when bad loans were made and elicit from an FDIC expert witness the opinion that the Bank's board, generally

16

speaking, had been grossly negligent in its loan supervision. No evidentiary basis existed upon which the jury could have rationally apportioned liability among the settling and non-settling defendants. *See generally* STEPHEN M. FLANAGAN & CHARLES R.P. KEATING, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 1087.1 (1986). We therefore need not decide the proportionate reduction/*pro tanto* issue.

Of course, the FDIC is not entitled to keep any double recovery that might be occasioned by the partial settlement and the judgment. As in *Mmahat,* if the money paid by the settling defendants is attributable to any or all of the same loans for which the nonsettling defendants were held liable, then the nonsettling defendants should get a dollar-for-dollar credit for the appropriate amount. *See Mmahat,* 907 F.2d at 550. We therefore remand this issue to the district court to determine what portion of the amount paid by the settlors is attributable to the bad loans sued upon by the FDIC.

### 3. *Mitigation of Damages*

The defendants in this case tendered to the district court, and the court refused to give, the following proposed instruction regarding the FDIC's duty to mitigate damages:

> A party claiming damages has a duty to mitigate or minimize its damages as the result of an alleged wrongful act on the part of another party by using reasonable diligence and reasonable means under the circumstances in order to prevent the aggravation of such damages and further loss to itself. If you find that the FDIC failed to take reasonable measures to seek out or take advantage of business opportunities to minimize its losses you should reduce the amount of damages you find appropriate by the amount of damages the FDIC could have saved under the circumstances.

17

This proposed instruction was based on one given by the district court in *Mmahat.* The *Mmahat* defendant complained of this instruction on appeal, and we deferred to the district court's broad discretion to formulate a charge. *Mmahat,* 907 F.2d at 552.

The individual defendants also cite *FDIC v. Wheat* in support of their proposed jury instruction regarding the FDIC's duty to mitigate damages. *Wheat* was a case in which the FDIC sued the former director of an insolvent bank for negligence, breach of fiduciary duty, and breach of contract. *Wheat,* 970 F.2d at 126. Following a jury verdict in favor of the FDIC, the defendant director appealed to our court, contending *inter alia* that the district court had erred in failing to submit a jury instruction regarding the FDIC's duty to mitigate damages. *Id.* at 132. We noted that the FDIC had in fact mitigated to the full extent "legally possible," and so held that no jury instruction was required. *Id.* The defendants in the instant case argue that *Wheat* and *Mmahat* stand for the proposition that the FDIC has a duty to mitigate its damages like any other plaintiff.

The FDIC responds with a litany of cases holding that the FDIC is not subject to the state law defense of mitigation of damages. It appears that the Seventh Circuit is the only court of appeals to have considered the issue, and that court held that the FDIC is not subject to the mitigation of damages defense when it sues former directors and officers in its corporate capacity to recover losses sustained by an insolvent bank. *FDIC v. Bierman,* 2 F.3d 1424, 1438-41 (7th Cir.1993) (relying on the discretionary function

18

exception to the Federal Tort Claims Act and the lack of a duty to the wrongdoers). The great majority of the district courts are in accord with the conclusion reached by the *Bierman* court. *See Resolution Trust Corp. v. Fleischer,* 835 F.Supp. 1318, 1321 n. 5 (D.Kan.1993) (collecting cases). District courts within our circuit have come to different results. *Compare Resolution Trust Corp. v. Evans,* 1993 WL 354796, at *4 (E.D.La. Sept. 3, 1993) (unpublished opinion) (refusing to strike defendants' affirmative defense of failure to mitigate damages) *with FSLIC v. Shelton,* 789 F.Supp. 1367, 1370 (M.D.La.1992) (holding that the FDIC owes no duty to mitigate damages to insolvent institutions or to their culpable directors).

We agree with the FDIC that our decisions in *Mmahat* and *Wheat* do not preclude us from consideration of this issue. Neither the *Mmahat* court nor the *Wheat* court appears to have addressed the FDIC's argument that the mitigation of damages defense is inapplicable to the FDIC in suits against officers and directors of failed financial institutions. In *Mmahat,* only the defendant raised any question about the jury instructions, and we simply passed on the form of the instruction without considering whether it should have been given at all. *Mmahat,* 907 F.2d at 552. It also appears that this issue was not raised by the FDIC in *Wheat;* our decision was limited to the conclusion that the FDIC did mitigate "to the full extent legally possible." *Wheat,* 970 F.2d at 132.

Several rationales support the FDIC's position on this issue.

19

Many courts have held that public policy prohibits defendant directors and officers from asserting the mitigation of damages defense against the FDIC, reasoning that the risk of errors in judgment by FDIC personnel should be borne by the directors and officers who were wrongdoers in the first instance rather than by the national insurance fund. *Fleischer,* 835 F.Supp. at 1322; *FSLIC v. Burdette,* 718 F.Supp. 649, 663 (E.D.Tenn.1989). Courts have also invalidated the mitigation of damages defense as against the FDIC because the conduct of the FDIC "should not be subjected to judicial second guessing," and because the FDIC owes no duty to failed financial institutions or to their former directors and officers. *Fleischer,* 835 F.Supp. at 1322. Still another approach has been to view the FDIC's conduct in managing failed banks as insulated from affirmative defenses such as mitigation of damages by the discretionary function exception to the Federal Tort Claims Act (FTCA). *Id.* at 1324.

In *Bierman,* the Seventh Circuit relied upon both the policy considerations that favor liberating the FDIC from the duty to mitigate damages and the discretionary function to the FTCA rationale. Taking note of the Supreme Court's recent decision in *United States v. Gaubert,* 499 U.S. 315, 326, 111 S.Ct. 1267, 1275, 113 L.Ed.2d 335 (1991) (holding that actions taken by the Federal Home Loan Bank Board in supervising a savings and loan at the day-to-day operational level could come within the discretionary function exception to the FTCA), the *Bierman* court concluded that exempting the FDIC from the affirmative defenses of contributory

negligence and mitigation of damages "is consonant with the purpose of the discretionary function exception to the FTCA." *Id.* at 1441. In sum, "the discretionary exception to the FTCA and the lack of a duty to the wrongdoers ... prevent the assertion of affirmative defenses against the FDIC." *Id.*

After careful consideration, we agree with the Seventh Circuit's cogent analysis of the issue in *Bierman. See id.* at 1438-41. For the reasons stated in that case, we hold that the FDIC is not subject to the affirmative defense of failure to mitigate damages when it sues former directors and officers in its corporate capacity to recover losses sustained by an insolvent financial institution and covered by the national insurance fund. The district court did not err in refusing to instruct the jury regarding the FDIC's duty to mitigate damages.

4. *Liability for Loans Funded Before 1981 But Renewed During or After 1981*

The district court refused to give the jury the following instruction proposed by the defendants:

> This lawsuit involves only events or omissions that occurred between January 1, 1981, and December 31, 1984. Therefore, you must not consider any event or omission which caused the loss, such as the approval or the funding of a loan or the renewal of a loan, which occurred before January 1, 1981, or after December 31, 1984, in determining damages. For example, if a loan is funded in 1979, but renewed in 1982, you will be asked to determine what amount of loss, if any, was caused by the original approval of the loan at the time in 1979 and what amount of the loss, if any, was caused by the renewal of the loan in 1982 or the placing of a loan in another person's name. The defendants would be responsible for only those losses caused by the renewal of the loan in 1982. The defendants would not be responsible for any loss caused by the funding of a loan prior to 1981.

> In determining whether there is a loss on the renewal of

21

a loan between January 1, 1981, and December 31, 1984, you will be asked to determine whether the bank increased its loss by not foreclosing on the property and filing suit against the borrower at the time of the renewal between January 1, 1981, and December 31, 1984. The defendants contend that these workout loans did not increase the loss of the bank. The defendants believe that the loss had already occurred on these loans prior to 1981, and any event which occurred after 1981 did not increase the loss. The plaintiff contends that the loss could have been reduced or eliminated if the bank had not renewed certain loans between January 1, 1981, and December 31, 1984.

If you determine that the defendants were grossly negligent by not filing suit and foreclosing on the property, then you must determine how much of the loss, if any, is allocated to the delay in collecting on the note for any loan funded prior to 1981. The damages, if any, would be limited solely to the delay in collecting on the note between January 1, 1981, and December 31, 1984, and any new extensions of funds after January 1, 1981, but before December 31, 1984.

Some of the allegedly imprudent loans on which the FDIC sued the defendants were actually funded by the Bank before January 1, 1981, but later renewed or transferred to new borrowers. The individual defendants argue that the FDIC's complaint, however, complains only of acts and omissions between January 1, 1981, and June 13, 1986, and that they were entitled to the above-quoted jury instruction to prevent jury confusion.

The FDIC makes several responses to this argument. For one, it argues that the defendants may not rely on the dates as stated in the FDIC's complaint because the complaint was superseded by the pretrial order, in which the FDIC's contentions encompassed conduct prior to 1981. *See Ash v. Wallenmeyer,* 879 F.2d 272, 274 (7th Cir.1989) ("The information [obtained in the discovery process] is to be reflected in the pretrial order, which supersedes the complaint."). The FDIC further contends that the jury clearly

22

found that all of the grossly negligent conduct for which it awarded damages occurred during the years 1981 through 1984, so the defendants' focus on conduct occurring before 1981 is irrelevant. The FDIC also cites *FDIC v. Robertson,* 1989 WL 94833, at *5-6 (D.Kan.1989) (unpublished opinion), for the proposition that bank directors may be held liable for imprudent extensions and renewals of loans, as well as for imprudent loans themselves. The defendants do not deny this as an abstract proposition of law, but they argue that the jury in the instant case was given insufficient guidance in its instructions to be able to separate damages caused by imprudent loans made before 1981 from damages caused by imprudent renewals granted after January 1, 1981.

We agree with the FDIC's argument that the jury interrogatories were sufficiently clear so that the defendants were not entitled to the proposed instruction. The jury interrogatories asked the jury to assign a damages amount to each problem loan or set of loans. Additionally, the jury was required to make factual findings as to *when* the grossly negligent acts and omissions that caused the damages occurred. The interrogatories required the jury to find what portion of the damages attributable to each loan or set of loans was traceable to grossly negligent acts and omissions occurring before 1981, between 1981 and 1983, during 1984, and after 1984. The jury found in every case that no damages were traceable to acts or omissions occurring before 1981. We hold that these interrogatories afforded sufficient guidance to the jury in separating the funding of loans and the renewal of loans or the

23

transfer of loans to new borrowers. Because the interrogatories gave the jury sufficient guidance, it was not reversible error for the district court to refuse to give the proposed instruction. *Treadaway,* 894 F.2d at 168.

We do not agree with the defendants' contention that our holding will make bank directors automatically responsible for 100% of the amount of any past credit transaction simply because they opt to renew, extend or restructure a problem loan. The law simply requires them to act with greater care than gross negligence when they do renew problem loans, and these jury instructions sufficiently allowed the jury to make the relevant factual findings. The district court did not abuse its discretion in refusing to instruct the jury as desired by the defendants on this issue.

5. *Calculation of Interest*

Accrued interest accounts for some $12 million of the total amount of damages awarded. The district court instructed the jury that "the damages recoverable by the FDIC on account of an imprudent loan would be the uncollected amount of the principal ... plus accrued interest owing on or attributable to such loan *at the rate of interest that the borrower agreed to pay*" (emphasis added). The defendants argue that the district court erred in using contractual interest rates rather than the government's actual cost of funds. They cite testimony from the FDIC's damage expert at trial in support of the proposition that the damage figure for interest would be reduced by $3.5 million if the government's cost

of funds were used.  The FDIC responds that the court correctly instructed the jury with respect to the calculation of interest.

The parties do not adequately explain to this court how the interest on the problem loans was factored into the verdict and judgment in this case, so we have reviewed the pertinent parts of the record ourselves.  Each jury interrogatory asked the jury to consider a single problem loan and to assign to that loan an "amount of loss caused as a result of [the individual defendants'] gross negligence."  The total amount of loss found by the jury, as we have already noted, was roughly $28.5 million.  This figure, according to the FDIC's damages expert at trial, consisted of $17 million of outstanding principal when the Bank closed in June 1986, $2 million of outstanding interest as of June 1986, plus interest at the contractual rate computed over the next five and a half years—that is, up to the time of trial, which ended in December 1991.  The district court entered judgment in September 1992 for a total of $28,460,874 against the individual defendants, plus an additional $2,413,512.75 as prejudgment interest.  Thus, the court awarded the FDIC roughly 11.37 prejudgment interest for the period from December 1991 to September 1992 on the damages found by the jury.

The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) provides that the FDIC shall be able to recover "appropriate interest" as damages against liable directors and officers of insured depository institutions.  12 U.S.C. § 1821(*l* ).  Unfortunately, case law addressing the appropriate rate

25

of interest to be awarded is, to say the least, sparse.

For support, the defendants cite *FDIC v. Gordinier,* 783 F.Supp. 1181 (D.Minn.1992), *rev'd on other grounds sub nom. FDIC v. St. Paul Fire and Marine Ins. Co.,* 993 F.2d 155 (8th Cir.1993). The court in *Gordinier,* without discussion, awarded prejudgment interest at the note rate until the insolvent bank was closed and "thereafter (if lower than the note rate) at 87 per annum for 1987 and 1988 and at 77 per annum for 1989 and thereafter." *Id.* at 1188. The source of the 77 and 87 rates is not clear, but the court plainly decided that these rates should be a ceiling for post-closure interest.

In opposition the FDIC relies on *FDIC v. Burrell,* 779 F.Supp. 998 (S.D.Iowa 1991). In that case, the defendant directors and officers argued that the FDIC's claims against them were unliquidated until the date the jury returned its verdict (and that interest thus did not begin to run until that date under Iowa law). *Id.* at 1001. The court held that "submission of the claim plus the contract rate of interest did not make the amount claimed unliquidated." *Id.* at 1002. The FDIC also cites *FDIC v. Stanley,* 770 F.Supp. 1281, 1315 (N.D.Ind.1991), *aff'd sub nom. FDIC v. Bierman,* 2 F.3d 1424 (7th Cir.1993), in which the district court awarded principal and interest (apparently at the contractual rate) on loan losses up through the date of trial.

None of the cases cited by the parties articulates a legal principle to explain the result reached, much less the source of the underlying principle. More to the point, the defendants have

26

not directed our attention to any point in the proceedings below when their argument was made to the district court, and we have found none. The defendants advert only to a colloquy between International's counsel and the district court during which counsel argued that it was improper to ask the jury to calculate damages on each loan as a lump sum of principal and interest; counsel argued that the correct approach would be to ask the jury first what portion of the principal the defendants were responsible for, and then add the interest to that amount. This does not amount to an argument to the district court that the government's cost of funds should have been used as the interest rate instead of the contract rate, nor do the defendants direct our attention to any place in the record at which such an argument was made. Indeed, our review of the defendants' proposed changes to the jury instructions shows that no complaint was made about the jury instruction regarding interest, nor was a proposed instruction stating the defendants' view of the law proffered. As we have held, if a litigant desires to preserve an argument for appeal, the litigant must press and not merely intimate the argument during the proceedings before the district court. If an argument is not raised to such a degree that the district court has an opportunity to rule on it, we will not address it on appeal. *Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.),* 6 F.3d 1119, 1128 (5th Cir.1993).

B. Evidence of Post-Closing Damages

The district court ruled that no evidence would be permitted concerning the activities of the FDIC in its efforts to manage and

collect on loans that were owed to the Bank at the time it was closed. The defendants point out that the FDIC's damage model computed damages from each problem loan as the sum of the outstanding principal and accrued interest on November 4, 1991 (the day before trial), less any proceeds from the sale of collateral or the value of unliquidated collateral on that same date. The individual defendants now complain that they should have been allowed to introduce evidence that the FDIC's conduct was the proximate cause of some of the losses claimed by the FDIC. As an example, the defendants refer us to the trial testimony of Jerry Fowler, to whom one of the problem loans was made. The district court ruled before Fowler began to testify that the defendants could not ask Fowler whether he could have repaid the loan, or even whether the FDIC had ever contacted him about repaying the loan. The defendants contend that they should have been allowed to introduce evidence of this type in order to show that their gross negligence was not the proximate cause of the damages, particularly in light of the district court's jury instruction no. 33:

> The directors and officers claim that even if they breached their duties in making or allowing the loans in this case to be made, some of the damages sustained by the bank were caused not by their breaches of duty but by certain intervening causes. The law provides that a defendant is relieved of liability for damages caused by intervening events, but only if those events were so unforeseeable as to break the chain of causation set in motion by the alleged acts or omissions of gross negligence which occurred.

The FDIC argues that the defendants' argument regarding evidence of events occurring after closure of the Bank is simply an end-run around the rule that the FDIC has no duty to mitigate

28

damages. The FDIC draws support from cases such as *Resolution Trust Corp. v. Youngblood,* 807 F.Supp. 765, 774 (N.D.Ga.1992), in which the court struck the defendants' affirmative defenses of comparative negligence and mitigation of damages. The *Youngblood* court recognized that the defendants were entitled to challenge the RTC's proof of the element of proximate cause, but it insisted that "under the "no-duty' rule, the RTC's conduct is not on trial, whether under the label of proximate cause or affirmative defense." *Id.* at 773; *see also FDIC v. Isham,* 782 F.Supp. 524, 532 (D.Colo.1992) ("The defense of lack of causation is stricken to the extent that defendants seek to put FDIC's conduct at issue. However, defendants are free to contest that their negligence, if any, did not proximately cause the damages FDIC claims."). In the FDIC's view, the defendants were free to contend that their gross negligence was not the proximate cause of the damages claimed, and they did in fact introduce evidence to show that changes in the tax laws, declines in collateral values, and the general deterioration of the economy were intervening causes of the damages. The defendants could also (and, the FDIC claims, did) challenge the FDIC's evidence regarding the salvage value of unliquidated collateral and thereby attack the damages figure recommended by the FDIC. The jury, however, found to the contrary.

The FDIC's argument is persuasive. Because the FDIC is not subject to the affirmative defense of mitigation of damages, the defendants were also not entitled to attack the causation element of the FDIC's case by showing that the FDIC's acts and omissions

29

caused the damages it sought to recover from the defendants. All other avenues of proving that their gross negligence did not proximately cause the losses remained open to them. The district court did not abuse its discretion in excluding the evidence.

## C. CONCLUSION

The judgment against the individual defendants is AFFIRMED, and we REMAND only for determination of the appropriate credit for amounts received by the FDIC in settlements with other parties.

## IV. INSURANCE COVERAGE ISSUES

The court below awarded the FDIC $17,504,946, plus prejudgment and postjudgment interest, to be paid by the individual defendants' D & O insurer, International, based on the coverage provided under the 1983 policy. International contends that the district court erred in ruling that insurance coverage existed under that policy for the damages stemming from claims during 1981-1983. The FDIC and the individual defendants defend this ruling by the district court, but they also contend that the district court erred in holding that the damages stemming from occurrences in 1984 were not covered by the 1984 policy.

The parties make numerous arguments regarding the existence and extent of the insurance coverage. International contends, *inter alia,* (1) that coverage does not exist because no "claim" was made against the individual defendants during the policy periods, (2) that even if a claim had been made against the individual defendants during a policy period, the failure to give notice of any claim to International until 1989 defeats coverage, and (3)

30

that the individual defendants did not give International notice of any potential claims as required by the insurance policies in order to invoke coverage.  The FDIC, joined by the individual defendants, argues, *inter alia,* (1) that the district court correctly held that claims were made against the individual defendants during the policy periods, (2) that the district court correctly held that the D & O policies did not require the individual defendants to give International notice of claims in order to invoke coverage, (3) that, in the alternative, the individual defendants gave International notice of potential claims as required by the policies in order to invoke coverage, and (4) that the district court erred in holding that coverage under the 1984 policy was barred under the classified loan exclusion clause contained in that policy.

A. ADDITIONAL BACKGROUND

1. *Facts and Procedural History*

The 1983 D & O policy issued by International contains the following relevant provisions:

1. *INSURING CLAUSE*

> If during the policy period any claim or claims are made against the Insureds (as hereinafter defined) or any of them for a Wrongful Act (as hereinafter defined) while acting in their individual or collective capacities as Directors or Officers, the Insurer will pay on behalf of the Insureds or any of them, their Executors, Administrators, Assigns 957 of all Loss (as hereinafter defined), which the Insureds or any of them shall become legally obligated to pay....

. . . . .

4. *DEFINITIONS*

Definitions of terms used herein:

31

(a) The term "Insureds" shall mean all persons who were, now are or shall be duly elected Directors or Officers of the [Bank]....

(b) The term "Wrongful Act" shall mean any actual or alleged error or misstatement or misleading statement or act or omission or neglect or breach of duty by the Insureds while acting in their individual or collective capacities, or any matter not excluded by the terms and conditions of this policy claimed against them solely by reason of their being Directors or Officers of the [Bank].

(c) The term "Loss" shall mean any amount which the Insureds are legally obligated to pay for a claim or claims made against them for Wrongful Acts, and shall include but not be limited to damages, judgments, settlements and costs, cost of investigation (excluding salaries of officers or employees of the [Bank] ) and defense of legal actions, claims or proceedings and appeals therefrom, cost of attachment or similar bonds; providing always, however, such subject of loss shall not include fines or penalties imposed by law, or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed.

. . . . .

. . . . .

9. *LOSS PROVISIONS*

If during the policy period or extended discovery period:

(a) The [Bank] or the Insureds shall receive written or oral notice from any party that it is the intention of such party to hold the Insureds responsible for the results of any specified Wrongful Act done or alleged to have been done by the Insureds while acting in the capacity aforementioned; or

(b) The [Bank] or the Insureds shall become aware of any occurrence which may subsequently give rise to a claim being made against the Insureds in respect of any such alleged Wrongful Act;

and shall in either case during such period give written notice as soon as practicable to the Insurer of the receipt of such written or oral notice under Clause 9(a) or of such occurrence under Clause 9(b), then any claim which may subsequently be made against the Insureds arising out of such alleged Wrongful Act shall, for the purposes of this policy,

be treated as a claim made during the policy year in which such notice was given or if given during the extended discovery period as a claim made during such extended discovery period.

The [Bank] or the Insureds shall, as a condition precedent to the Insureds' right to be indemnified under this policy, give to the Insurer notice in writing as soon as practicable of any claim made and shall give the Insurer such information and cooperation as they may reasonably require and as shall be in the Insureds' power.

. . . . .

. . . . .

13. *DISCOVERY CLAUSE*

If the Insurer shall cancel or refuse to renew this policy, the Insureds shall have the right, upon payment of an additional premium calculated at 107 of the three-year premium hereunder, to an extension of the cover granted by this policy in respect of any claim or claims which may be made against the Insureds during the period of ninety (90) days after the effective date of such cancellation or, in the event of such refusal to renew, the date upon which the policy period ends, but only in respect of any Wrongful Act committed before such date. Such right hereunder must, however, be exercised by the Insureds by notice in writing to the Insurer not later than ten (10) days after the date referred to in the preceding sentence. If such notice is not given, the Insureds shall not at a later date be able to exercise such right.

The 1984 policy contains clauses identical to those quoted above.

The policies also contain certain exclusionary clauses. The 1983 policy was amended effective September 22, 1982, to increase the policy limit to $10 million and to add the following clause (referred to herein as the "classified loan exclusion"):

Also, it is hereby understood and agreed the insurer shall not be liable to make any payment for loss in connection with any claim made against the insureds/directors or officers for or arising out of the granting of any loan which shall be deemed classified by any regulatory body or authority.

Less then two months later, on November 16, 1982, International issued a new endorsement to the 1983 policy whereby the

33

exclusionary clause quoted above was deleted in its entirety.  This

clause reappeared in the 1984 policy and remained a part of that

policy from its inception on January 1, 1984.  Another exclusionary

clause (referred to herein as the "regulatory exclusion") also

appears in the 1984 policy, and it provides as follows:

> In consideration of the premium charged, it is further understood and agreed that the insurer shall not incur any obligation under the terms and conditions of this policy for, or on account of, any claim:
>
>> 1. arising out of, based upon or related to:
>>
>>> A. the insolvency of the [Bank];  or
>>>
>>> B. financial impairment of the [Bank];  or
>>>
>>> C. any action, ruling or intervention of any federal, state or local governmental agency or office;
>>
>> 2. made by, or on behalf of, any federal, state or local governmental agency or office.

The insurance coverage issues were dealt with in the course of

the litigation as follows.  International filed a motion for

summary judgment, arguing that no coverage was available under

either the 1983 or the 1984 policy.  The district court denied the

motion before trial.  After trial, the parties filed voluminous

briefs with the district court addressing the coverage issues, and

on June 30, 1992, the district court held that International was

liable on the 1983 policy for the damages caused by the individual

defendants' grossly negligent acts during the years 1981 through

1983.  The court further held, however, that the classified loan

exclusion in the 1984 policy protected International from any

liability under that policy.  This memorandum ruling is reported as

34

*FDIC v. Mijalis,* 800 F.Supp. 397 (W.D.La.1992).

## 2. *Claims Made Insurance*

Before beginning our analysis, we note that the policies involved in this litigation are "claims made" rather than "occurrence" policies. Under claims made policies, the mere fact that an insured loss-causing event occurs during the policy period is not sufficient to trigger insurance coverage of the loss. Such policies also typically require the insured to give prompt notice to the insurer of any claims asserted against the insured, as well as of any occurrences that have caused or will potentially cause an insured loss. As amicus points out, these policies are commonly used as professional liability insurance because malpractice by a professional such as a doctor or an architect may not lead to the assertion of a claim until years after expiration of the actual insurance policy. The notice requirements in claims made policies allow the insurer to "close its books" on a policy at its expiration and thus to "attain a level of predictability unattainable under standard occurrence policies." *Burns v. International Ins. Co.,* 709 F.Supp. 187, 191 (N.D.Cal.1989), *aff'd,* 929 F.2d 1422 (9th Cir.1991). By increasing predictability and reducing their potential exposure, insurers may be able to reduce the policy cost to the insured, or so the theory goes. *FDIC v. St. Paul Fire and Marine Ins. Co.,* 993 F.2d 155, 158 (8th Cir.1993). Thus, notice provisions are integral parts of claims made policies.

### B. OF "CLAIMS," "OCCURRENCES," AND "NOTICE"

The FDIC and International engage in a spirited battle over

35

the existence and scope of insurance coverage for the liabilities of the individual defendants. Before addressing the merits of their arguments, we must trace the steps of the district court's analysis of the policies. The district court concluded that insurance coverage would be triggered under the 1983 and 1984 policies if either of two events occurred during the policy periods: (1) a claim was made against an insured, or (2) notice of a specified wrongful act or occurrence was given to the Bank or to an insured. *Mijalis,* 800 F.Supp. at 400. The court also addressed the proper application of the policies' notice provisions. In a memorandum ruling before trial, the district court held that *no* notice to International was required under the policy in the event that actual "claims" were made against the insureds. In the post-trial memorandum ruling cited above, the court interpreted clause 9 of the policies to require written notice to International of acts or occurrences amounting to potential claims; the court further held, however, that this notice provision was unenforceable against the FDIC under the Louisiana direct action statute because International had not shown prejudice from the lack of notice. *Id.* The district court concluded that coverage existed because "claims" had been made against the individual defendants during the policy periods. *See id.* at 400-02.[4] We consider first International's arguments that no claims were made against the individual

---

[4]The district court did not decide whether the second method of establishing coverage—notice to the Bank or an insured of a specified wrongful act or occurrence—was also satisfied in this case.

defendants during the policy periods.

## 1. *Claims*

The first issue is whether the district court erred in determining that claims had been made against the Bank during the years 1981 through 1984, thus triggering insurance coverage under the "insuring clauses." The policies, the court noted, did not define the term "claim." *Id.* at 400. The court first held that the word "claim," as used in the D & O policies, means "a demand on the insured by a third party for the performance of some act which the third party has a legal right to require." *Id.* (citing *FDIC v. Lensing,* No. 89-0013 (W.D.La. March 20, 1990) (magistrate's recommendation and report)). The district court held that the regulatory directives and demands made on the Bank's directors and officers by the FDIC during the policy periods satisfied the policies' requirements that claims be made on the insureds during the policy periods. *Id.* at 401-02. International contends that the district court erred, and it cites several cases from around the country as contrary authority.

"Claims made" insurance policies of the type involved in this case are not new to this court's experience, and we have held that the determination of whether a given demand is a "claim" within the meaning of a claims made policy requires a fact-specific analysis to be conducted on a case-by-case basis. *MGIC Indem. Corp. v. Central Bank,* 838 F.2d 1382, 1388 (5th Cir.1988). Of course, a claim is clearly made when an outside party files suit on a demand based on an act or omission of an officer or director. *Id.* Other

37

communications to the insured may or may not rise to the level of claims depending on their content. We have noted the view that the expectations of the insured upon receiving or responding to a communication or inquiry cannot be determinative of whether a claim has been made because of the uncertainty such a rule would create. *Jensen v. Snellings,* 841 F.2d 600, 616 (5th Cir.1988) (citing *Hoyt v. St. Paul Fire & Marine Ins. Co.,* 607 F.2d 864, 866 (9th Cir.1979)).

The FDIC vigorously argues that its communications to the individual defendants during the policy periods were claims within the meaning of that term as used in the insurance policies. Relying on the definition used by the district court, the FDIC contends that the cease and desist order, the notice of charges, and the other demands for corrective action it made on the Bank during the policy periods constituted demands for the performance of acts that the FDIC had the right to require of the Bank and its directors.

International relies on our recent decision in *FDIC v. Barham,* 995 F.2d 600, 604 (5th Cir.1993), for the proposition that the term "claim" as used in these D & O policies encompasses only "a demand which necessarily results in a loss—i.e., a legal obligation to pay—on behalf of the directors." *Barham* involved a third-party claim by the directors of a failed bank against their D & O insurer after they had been sued by the FDIC for authorizing imprudent loans. *Id.* at 601. The insurer sought refuge in the D & O policy's reporting and notice clause, contending that the directors

38

had not reported claims and wrongful acts to the insurer as required. *Id.* at 603. In response, the directors argued that the insurer had been given constructive notice of a claim because its agent had discovered a "letter of agreement" between the bank and the Office of the Comptroller of the Currency (OCC) during an insurance risk survey. *Id.* at 604. The bank agreed in the letter of agreement to adopt and implement policies and procedures to prevent future legal and regulatory infractions. *Id.* The district court granted summary judgment in favor of the insurer, holding that no "claim" had been made on the directors, and we affirmed. *Id.* at 601.

The *Barham* court rejected the argument that the letter of agreement between the OCC and the insolvent bank constituted a claim within the meaning of the D & O policy. *Id.* ("[A] demand for regulatory compliance does not rise to the level of a claim, as that term is used in the policy."). As in the instant case, the term "claim" was not defined in the D & O policy, *id.* at 604 n. 10; the court relied instead on the language of the policy's insuring clause, which provided:

> The [insurance] Company shall pay on behalf of each of the Insured Persons all Loss, for which such Insured Person is not indemnified by the Insured Organization, and which such Insured Person becomes legally obligated to pay on account of any claims(s) [sic] made against him, individually or otherwise, during or after the Policy Period for a Wrongful Act[.]

*Id.* at 602. The insured directors argued in *Barham* that the letter of agreement between the OCC and the ultimately insolvent bank constituted a claim that had been reported to the insurer. *Id.* at

39

604. The court disagreed: "[b]ecause the 1982 letter [of agreement] makes no reference to a loss which [the bank] may sustain as a result of its failure to comply with certain banking regulations, we conclude that no claim was reported to [the insurer] during the policy period." *Id.* at 605.

The FDIC attempts to distinguish *Barham* by arguing that the *Barham* court's conclusion that the term "claim" was unambiguous, *id.* at 604, should not apply to the instant D & O policies. Thus, argues the FDIC, familiar rules of contract interpretation dictate that we should interpret the policies in favor of coverage. *Id.* at 603; *Bingham v. St. Paul Ins. Co.,* 503 So.2d 1043, 1045 (La.Ct.App.1987). International responds that there is no material difference between the policy at issue in *Barham* and those it issued to the Bank in this case, and that we must therefore use the same definition of claim as that used by the *Barham* court.

We conclude that the instant policy language, although different from that used in the policy in *Barham,* is no more ambiguous than the language we construed in *Barham.* The term "claim" is intimately connected with the term "loss" in the insuring clause, and it appears as part of the definition of "loss" as well. The policy provides that International will pay 957 of "losses" suffered by the insureds, and that those losses are, quite simply, amounts that the insureds become "legally obligated to pay for a claim or claims made against them." It is clear that the policy envisions "claims" as being closely related to legal obligations to pay money, and that the *Barham* definition of claim

40

should apply to the instant case. *See Resolution Trust Corp. v. Miramon,* 1993 WL 292833, at *5 (E.D.La. July 27, 1993) (unpublished opinion) (applying the *Barham* definition of "claim" in the interpretation of a D & O policy very similar to those issued by International in the instant case).

The FDIC next seeks to distinguish *Barham* by arguing that the communications and demands it made of the Bank during the policy periods were materially different from the letter of agreement involved in that case. The FDIC specifically relies on numerous letters it sent to the Bank's board of directors advising the board of the FDIC's concern and insisting that the Bank cease its unsafe lending practices. International responds that the regulatory demands made by the FDIC during the policy periods were not substantially different from the one considered in *Barham.* Under *Barham,* the appropriate inquiry is whether these communications referred to demands that would necessarily result in losses to the directors as a result of their failure to comply with the relevant banking regulations. *See Barham,* 995 F.2d at 604; *see also MGIC Indem. Corp. v. Home State Sav. Ass'n,* 797 F.2d 285, 288 (6th Cir.1986) (interpreting a claims made policy to be "speaking not of a claim that wrongdoing occurred, but a claim for some discrete amount of money owed to the claimant on account of the alleged wrongdoing"); *FDIC v. Continental Casualty Co.,* 796 F.Supp. 1344, 1351-52 (D.Or.1991) (holding that a cease and desist order was not a "claim" because "it fell short of holding the directors and officers personally liable for the misconduct or seeking money

41

damages from them"); *cf. California Union Ins. Co. v. American Diversified Sav. Bank,* 914 F.2d 1271, 1276 (9th Cir.1990) (stating that notices from regulatory agencies do not assert claims unless they threaten formal proceedings as a consequence of failure to comply or propose to hold directors personally liable for the noticed deficiencies), *cert. denied,* 498 U.S. 1088, 111 S.Ct. 966, 112 L.Ed.2d 1052 (1991).

The FDIC claims that some of its communications to the Bank's board specifically advised the directors and officers of the Bank of their potential liability. For instance, an FDIC examination report dated December 3, 1982, advised the Bank's board that "unsafe and unsound conditions may exist" that, unless addressed, could impair the Bank's future viability, threaten the interests of the Bank's depositors, and "pose a potential for disbursement of funds by the insuring agency." A March 31, 1983, letter to the Bank's board warned the board members that civil money penalties would be considered if prompt good faith efforts were not made to correct the Bank's violations of federal banking regulations. The FDIC also cites its June 1983 notice of charges and administrative hearing and the subsequent cease and desist order as conveying to the Bank's directors the potential for liability.

Most of the documents relied upon by the FDIC can be easily dismissed as falling outside the *Barham* definition of "claim." They are the same sort of general demands for regulatory compliance as the one before the *Barham* court. None of these documents clearly refers to an insured loss that the Bank would or might

42

sustain if it did not abide by the FDIC's mandates.  Even specific formal demands for corrective action do not rise to the level of "claims" unless coupled with indications that demands for payment will be made.  *See Barham,* 995 F.2d at 604.

There is, however, one arguable exception to this analysis: the FDIC did warn the members of the Bank's board of directors by letter dated March 31, 1983, that it was considering recommending civil money penalties under Federal Reserve Regulation O, 12 C.F.R. § 215(b), (d) (regulating insider lending).  The letter referred to the December 1982 examination report to the Bank in which the examiner noted,

> The bank is in apparent violation of the provisions of Federal Reserve Regulation O, as made applicable by the Federal Deposit Insurance Act....  Management should formulate policy which will ensure that the bank is operating within the framework of all applicable laws and regulations.  It should also be noted that the Corporation has the power to impose civil money penalties for such violations of $1,000 per day.

The March 31, 1983, follow-up letter advised the Bank's directors that

> [t]he violation [of Regulation O] are of serious concern and would ordinarily warrant recommendation of civil money penalties.  Based on the information presently available, however, further consideration of civil money penalties for the violations will be held in abeyance provided the bank, in good faith, initiates prompt efforts to correct the violations....  Please advise when the violations have been corrected and the method used to effect correction....  Should you not act in good faith, recommendation of civil money penalties will be reconsidered.

We proceed to analyze this communication in light of *Barham.*

In a broad sense, certainly, a threat to recommend civil money penalties would appear to come within the definition of claim we settled upon in *Barham.*  By warning the board that such penalties

43

would be recommended if the Bank's regulatory violations were not corrected, the letter arguably makes "a demand which necessarily results in a loss—i.e., a legal obligation to pay—on behalf of the directors." *Id.* at 604. Under the provisions of the Federal Deposit Insurance Act then in effect, 12 U.S.C. § 1828(j)(3)(A) (1982), either the Bank or its principals who participated in violations of Regulation O could be assessed civil money penalties of up to $1,000 per day. Of course, it could be argued that the March 31, 1983, letter is not a demand for payment by the Bank or the directors and does not even promise that such a demand will be made in the future; by its terms, the letter is arguably nothing more than a "demand for regulatory compliance"—albeit one backed with threatened consequences.

We need not decide, however, whether the March 31, 1983, letter satisfied the narrow definition of claim we settled upon in *Barham* because the insurance policies at issue exclude from definition of "Loss" any "fines or penalties imposed by law." Thus, the threatened "civil money penalties" are clearly excluded from coverage under the policies. *See Vallier v. Oilfield Constr. Co.,* 483 So.2d 212, 215-16 (La.Ct.App.), *cert. denied,* 486 So.2d 734 (La.1986) (holding that an exclusion of "fines or penalties imposed on the insured ... for failure to comply with the requirements of any workmen's compensation law" excluded coverage of civil penalties and attorney's fees provided for under Louisiana statute). It would be incongruous to hold that the threat of an uninsured loss could nevertheless constitute a claim within the

44

meaning of that term as used in an insurance policy. In our opinion in *Central Bank,* we held that a claim is indisputably made, at the latest, at the time a party files suit on a demand based on an act of a bank's directors or officers, which demand the bank has denied. *Central Bank,* 838 F.2d at 1388. Significantly, we continued,

> This is so regardless of whether the party making the claim names the director or officer as a party, as long as it is clear to the bank that the claim is based upon an action by a director or officer *that falls within the terms of the insurance contract.*

*Id.* (emphasis added). Because the civil money penalties that the FDIC threatened the Bank's board of directors with were not insured losses under the 1983 policy, the March 31, 1983, letter in which the FDIC threatened to recommend those penalties could not have been a claim within the meaning of the policy.

We conclude that *Barham* is controlling and that no claims were made on the Bank or its directors during the policy periods as was required under the 1983 and 1984 policies. Because no claims were made, we need not consider whether the district court correctly interpreted the policies not to require the insured to give notice to International of claims made as a condition precedent to coverage.

### 2. *Occurrences*

The FDIC next argues in the alternative, as it has in numerous recent cases around the country, that insurance coverage was triggered under clause 9(b) of the policies because the insureds gave written notice to International during the policy

45

periods of occurrences that might have given rise to claims being made against the insureds. Specifically, the FDIC argues that the Bank's renewal application submitted before the expiration of the 1983 policy disclosed the existence of the cease and desist order, which the FDIC views as "an occurrence that subsequently gave rise to the claims asserted" against the directors. The FDIC also directs our attention to financial information provided to International by the Bank during the 1984 policy period, such as a listing of the Bank's classified loans. According to the FDIC, these notices to International constituted notice of occurrences "which may subsequently give rise to a claim being made against the Insureds" within the meaning of clause 9(b) of the insurance policies.

We must digress before discussing the merits of the FDIC's arguments to deal with a point raised by amicus. International's policies provide coverage of losses for wrongful acts or occurrences that occur during policy periods and may give rise to future claims (but do not give rise to actual claims during a policy period) only if written notice of the occurrences is given as soon as practicable. Although the district court appears not to have relied on this "potential claims" coverage clause, it stated gratuitously that the portion of the clause requiring notice of the occurrences to International could not be enforced against the FDIC, as a third party suing under the Louisiana direct action statute, absent a showing of prejudice. As amicus points out, this ruling would alter the nature of claims made insurance coverage by

creating coverage in instances when an insured knows of a potential claim during the policy period and does not disclose this awareness to his claims made insurer, at least in the direct-action setting. The FDIC, for its part, appears to contend that amicus is misreading the district court's opinion; in its original brief the FDIC insists that the court's ruling "on notice does not extend to the notice required for occurrences which may subsequently give rise to claims." True to its word, the FDIC contends throughout its numerous briefs that International did in fact receive notice during the policy periods from the insureds of occurrences that could potentially give rise to claims, apparently conceding that mere "potential claims" could not be covered by the D & O policies unless International had in fact received notice of those potential claims.[5] We will take the FDIC at its word and assume that notice to International is a *sine qua non* of coverage of any potential claims known to the individual defendants during the policy periods. Although the Louisiana Supreme Court appears not to have addressed the issue, Louisiana's intermediate courts of appeals seem to agree with this position. *See Bank of Louisiana v. Mmahat, Duffy, Opotowsky & Walker,* 608 So.2d 218 (La.Ct.App.1992), *cert. denied,* 613 So.2d 994 (La.1993); *Bank of the South v. New England*

---

[5]The FDIC does not always take this position. In *FDIC v. Caplan,* 838 F.Supp. 1125, 1129 (W.D.La.1993), the FDIC pressed the argument that, as a third party suing under the Louisiana direct action statute, it could avoid the operation of notice provisions in a claims made D & O policy. The court held that the failure of the insureds to comply with the notice provisions precluded the FDIC's right of action against the insurer. *Id.* at 1131.

*Life Ins. Co.,* 601 So.2d 364 (La.Ct.App.1992).

Returning to the merits of this issue, we note that International responds, backed with an impressive list of cases, that the documents relied upon by the FDIC are not legally sufficient to constitute notices of potential claims and that non-specific communications merely disclosing that events have occurred do not satisfy the requirement of notice of potential claims. International relies not only on our recent opinion in *Barham* but also on our even more recent opinion in *McCullough v. Fidelity & Deposit Co.,* 2 F.3d 110 (5th Cir.1993). International also directs our attention to the cases relied upon in *Barham* and *McCullough,* such as a pair of cases from the Eighth Circuit, *American Casualty Co. v. FDIC,* 944 F.2d 455 (8th Cir.1991), and *FDIC v. St. Paul Fire and Marine Ins. Co.,* 993 F.2d 155 (8th Cir.1993), as well as one from the Ninth Circuit, *California Union Ins. Co. v. American Diversified Sav. Bank,* 914 F.2d 1271 (9th Cir.1990), *cert. denied,* 498 U.S. 1088, 111 S.Ct. 966, 112 L.Ed.2d 1052 (1991). These courts have construed insurance policies such as those at bar to require very specific notices from the insured to the insurer to trigger "notice of potential claims" coverage.

We addressed this identical issue in the *Barham* case, construing a clause requiring written notice of potential claims as requiring directors "to give written notice of the specific acts they considered to have claim potential." *Barham,* 995 F.2d at 605; *see also id.* at 604 n. 9 ("Because notice of a claim or potential claim defines coverage under a claims-made policy, ... the notice

48

provisions of such a policy should be strictly construed."). The FDIC distinguishes *Barham,* arguing that the notice provision involved in that case required more specific notice than the instant policy. The policy in *Barham* specified that notice of potential claims would be satisfied by written notice "of the material facts or circumstances relating to such Wrongful Act *as facts or circumstances having the potential of giving rise to a claim being made* against" the insureds. *Id.* at 602 (emphasis added). The FDIC argues that the language in clause 9(b) of the International policies is slightly more general than this language, and thus requires less specificity in the notice of potential claims to trigger coverage.

*McCullough* also presented this issue, and that case involved a notice clause requiring the insured to give notice of "any act, error, or omission which may subsequently give rise to a claim being made against the Directors and Officers ... for a specified Wrongful Act." *McCullough,* 2 F.3d at 112. The bank in *McCullough,* in conjunction with the policy renewal process, informed its D & O insurer that the OCC had issued a cease and desist order to one of its subsidiaries and that the bank was generally experiencing increased loan losses and delinquencies. *Id.* at 111. We affirmed summary judgment in favor of the insurer, holding that "[n]otice of an institution's worsening financial condition is not notice of an officer's or director's act, error, or omission." *Id.* at 113. We went on to hold that the proper focus of the district court's inquiry is whether the insured has *objectively* complied with such

49

a notice provision, and not whether the insurer has subjectively drawn inferences that potential claims exist from the materials submitted by the insured. *Id.* (emphasis added).

We relied on the Eighth Circuit's opinion in *American Casualty Co. v. FDIC,* 944 F.2d 455 (8th Cir.1991), in both *Barham* and *McCullough.* In *American Casualty,* a factually similar case, the directors argued that coverage under one policy was triggered because they gave their insurer adequate notice of potential claims during the application process for the succeeding policy. *Id.* at 460. The weaknesses of the bank's loan portfolio were fully revealed during the application process, and the insurer was informed that the bank expected to lose over $400,000 during the current year, that almost 2007 of the bank's capital was classified as problem assets, and that the OCC had issued a cease and desist order against the bank. *Id.* The Eighth Circuit concluded that this was not sufficient notice to the insurer and that no coverage existed. The court cited several facts as significant to its decision, such as the generality of the information provided to the insurer, the fact that it was mostly orally communicated, and the repeated representations of the chairman of the board of directors to the insurer that the bank was not in danger. *Id.*

*St. Paul Fire and Marine* is to similar effect. On essentially the same facts as *American Casualty* and as the instant case, the court held that the notice given in a renewal application was insufficient to give the insurer notice of potential claims. *St. Paul Fire and Marine,* 993 F.2d at 158-60. The court specifically

50

noted that the renewal application indicated no "occurrences" under the terms of the D & O policy, and that the bank actually responded negatively to specific questions about occurrences in the renewal application. *Id.* at 159. The bank also informed the insurer in the renewal application about certain problem conditions, including "extensions of credit which exceed the legal lending limit" and "significant violations of laws and regulations," but at the same time denied knowledge of any pending suits, claims, or occurrences that might give rise to a claim. *Id.* at 156-57. The court held that this information taken *in toto* was insufficiently specific and did not alert the insurer that any claim could have been asserted. *Id.* at 159. The court in *California Union* also rejected a claim that generalized information provided an insurer with "constructive notice" of potential claims. *California Union,* 914 F.2d at 1277-78; *see also American Casualty Co. v. Continisio,* 819 F.Supp. 385, 398 (D.N.J.1993) (construing a notice provision "as imposing a duty on the insured to give some kind of formal, written notification of occurrences in order to evoke coverage"); *Continental Casualty,* 796 F.Supp. at 1353 ("[T]here is a substantial difference between an insurer being on notice that an insured is a poor risk for future insurance, and its having received the specific notice required under [the terms of the D & O policy].").

Although subtle differences do distinguish International's insurance policies from those involved in the above-mentioned cases, we cannot conclude that the notice of potential claims clause is materially different from those involved in *Barham* and

51

*McCullough.* International's policies required the individual defendants to give International written notice as soon as practicable "of any occurrence which may subsequently give rise to a claim being made against the Insureds in respect of any ... Wrongful Act" done or alleged to have been done by the insureds while acting as directors or officers of the Bank. This is sufficiently similar to the language we interpreted in *McCullough* to warrant application of the full force of its holdings to the instant facts. The question is whether the information supplied to International by the insureds objectively gave "written notice of specified wrongful acts [by the] officers and directors." *McCullough,* 2 F.3d at 113. Subjective inferences drawn from general information by the insurer's representatives are irrelevant to the question of adequate notice. *Id.*

The FDIC argues at length that testimony at trial revealed that International was aware of potential claims against the Bank's directors through the financial information submitted by the Bank during the renewal process. Under *McCullough,* however, this evidence of International's subjective knowledge is not relevant. *Id.* The FDIC also relies on International's actions at the time of renewal as demonstrating International's anticipation that claims would be made against the Bank's directors by the FDIC. The "renewed" policy for 1984 halved the Bank's coverage, almost tripled the previous premium, and included new exclusionary clauses. Again, this does not prove that the financial information conveyed to International by the Bank objectively rose to the level

52

of notice of specific wrongful acts. It reflects only that International made a "reasonable business decision," *American Casualty,* 944 F.2d at 459, when confronted with the Bank's financial weakness. The FDIC's argument that the classified loan list provided to International during the 1984 policy period constituted notice of potential claims must fail for the same reasons. The *American Casualty* court held that informing the insurer of the classification of bank assets totalling almost 2007 of capital did not constitute sufficient notice of occurrences that might give rise to claims. *Id.* at 460. International also points out that the directors of the Bank represented to International on more than one occasion that they knew of the existence of no claims or potential claims against them, a factor which several of the opinions cited above treat as significant.

The FDIC urges that we should remand to the district court for a factual determination in the first instance of whether sufficient notice of potential claims was given to International. Our review of the record indicates that remand is unnecessary. We conclude that International was not given notice during the policy periods of occurrences that might give rise to future claims, and that insurance coverage was therefore not triggered under the "loss provisions" clause of the International policies.

## C. REMAINING ISSUES

Having held that International is not liable on its 1983 and 1984 policies, we find that we need not reach the remaining issues raised by the parties. The individual defendants contend that the

53

district court, for various reasons, should have reformed the 1984 policy to invalidate all of its terms that are inconsistent with those of the 1983 policy. As we have seen, however, the 1984 policy provides no insurance coverage for the same reasons that the 1983 policy provides none, none of which implicate the exclusionary clauses added to the 1984 policy. For the same reason we need not consider the FDIC's argument that the district court erred in holding that the classified loan exclusion in the 1984 policy barred coverage of losses suffered or caused during 1984. Plainly we need not reach International's and amicus's additional arguments for reversal. Because the FDIC concedes that insurance coverage existed under the "potential claims" clauses only if International was given notice of those potential claims, we do not decide whether the court below erred in stating that this notice provision was void as against the FDIC unless International could show prejudice resulting from the lack of notice.

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment below against Gus S. Mijalis, Alex S. Mijalis, John G. Cosse, John B. Franklin, and J. Harper Cox, Jr., and we REMAND only for determination of the appropriate credit for amounts received by the FDIC in settlements with other parties. We REVERSE the judgment against International Insurance Company and RENDER judgment in its favor. Costs shall be borne by the FDIC and by Gus S. Mijalis, Alex S. Mijalis, John G. Cosse, John B. Franklin, and J. Harper Cox, Jr.

54