FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for FirstSouth, F.A., Plaintiff,

v.

DELOITTE & TOUCHE, a partnership, and Deloitte, Haskins & Sells, a partnership, Defendants.

No. LRC–90–520.

United States District Court, E.D. Arkansas, W.D.

Sept. 3, 1993.

---

Peter B. Heister, Martha Jett McAlister, Eichenbaum, Scott, Miller, Liles & Heister, P.A., Little Rock, AR, John L. Conlon, Hopkins & Sutton, Chicago, IL, David B. Joeckel, Jr., Hopkins & Sutter, Dallas, TX, Stephen Novack, Marilyn Klawiter, Eric N. Macey, Novack & Macey, Chicago, IL, for plaintiff F.D.I.C.

Overton S. Anderson, Anderson & Kilpatrick, Little Rock, AR, David C. Wade, Martin, Tate, Morow & Marston, P.C., Memphis, TN, Richard D. Bernstein, Robert D. McLean, Sidley & Austin, Washington, DC, for defendants.

Peter G. Kumpe, Williams & Anderson, Little Rock, AR, for movants Henry F. Trotter, Jr. and FirstSouth FA.

### ORDER

EISELE, District Judge.

This action involves a complex case arising from the defendant accounting firm's ("Deloitte's") alleged negligent performance of audits at FirstSouth, a failed Arkansas savings and loan institution. The various motions pending raise two interesting and interrelated questions. The first issue is whether this Court has subject matter jurisdiction over contribution claims by Deloitte against the directors of FirstSouth. Secondly, the Court must address the effect of the FSLIC's settlement[1] with the FirstSouth directors. Specifically, the Court, through its choice of contribution rules, must decide how much liability Deloitte will absorb if the jury returns a verdict in favor of the FDIC.

### I. *Jurisdictional Issue*

The FDIC has stated in response to Deloitte's Contribution Motion that it "declined to join in that motion because of its concern that the Court may lack subject matter jurisdiction over Deloitte's claims against the Settling Directors for contribution." FDIC's Brief of 4–1–92 at p. 1. Although the Court initially indicated in a conference with the parties on August 25, 1992, that jurisdiction over the contribution claims existed, upon further reflection the Court finds that the issue is not so easily answered.

"Federal subject matter jurisdiction may be raised at any time during litigation and must be raised sua sponte by a federal court when there is an indication that jurisdiction is lacking." *Alumax Mill Products v. Congress Financial Corp.*, 912 F.2d 996, 1002 (8th Cir.1990) (quoting *Hughes v. Patrolmen's Benevolent Ass'n of City of New York, Inc.*, 850 F.2d 876, 881 (2d Cir.), *cert. denied,* 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988)). Unlike state courts, federal courts are courts of limited, not general, jurisdiction. The United States Supreme Court explained this fundamental premise in *Finley v. United States*, 490 U.S. 545, 548, 109 S.Ct. 2003, 2005, 104 L.Ed.2d 593 (1989) when it stated:

[T]wo things are necessary to create jurisdiction ... The Constitution must have given to the Court the capacity to take it, and an act of Congress must have supplied it ... To the extent that such action is not taken, the power lies dormant.

(quoting *The Mayor v. Cooper,* 6 Wall. 247, 252, 18 L.Ed. 851 (1868) (emphasis added by the *Finley* court)).

The *Finley* court acknowledged that *Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) was a departure from the rule that jurisdiction be explicitly conferred by federal statute. Under *Gibbs*, the Court allowed pendent claim jurisdiction to be asserted when the nonfederal claims between the parties derived from the same "common nucleus of operative fact" as the federal claims. Two other doctrines which were used to allow federal courts to hear cases in which no subject matter jurisdiction was expressly conferred on them by the Constitution, or by federal statute, were ancillary jurisdiction and pendent party jurisdiction. According to the loosely defined concept of ancillary jurisdiction, if a federal court has jurisdiction over the principal action, it also may hear any ancillary proceeding therein, regardless of the citizenship of the parties, the amount in controversy, the nature of the claim, or any other factor that normally

---

1. The FSLIC was the original receiver at FirstSouth. Congress later enacted legislation dissolving the FSLIC, and the plaintiff, the FDIC, became the FSLIC's successor.

would determine subject matter jurisdiction. The distinct but closely related doctrine of pendent party jurisdiction was generally available if (1) a substantial federal claim and the state claim or claims derived from a common nucleus of operative fact such that the plaintiff would ordinarily be expected to try them all in one judicial proceeding, and (2) "Congress in the statutes conferring jurisdiction has not expressly or by implication negated its existence." *Aldinger v. Howard,* 427 U.S. 1, 18, 96 S.Ct. 2413, 2422, 49 L.Ed.2d 276 (1976). In *Finley,* however, the Court distinguished sharply between pendent claims and pendent parties, stating that "a grant of jurisdiction over claims involving particular parties does not itself confer jurisdiction over additional claims by or against different parties." *Finley,* 490 U.S. at 556, 109 S.Ct. at 2011 (emphasis added). The Court held that an affirmative grant of pendent-party jurisdiction must be found in a statute, and further that "with respect to the addition of parties, as opposed to the addition of only claims, we will not assume that the full constitutional power has been congressionally authorized, and will not read jurisdictional statutes broadly." *Id.* at 549, 109 S.Ct. at 2007. The Supreme Court's language in *Finley* about having allowed "ancillary jurisdiction" only in "a narrow class of cases" called into question that line of cases too. Some lower courts were reading *Finley* as putting an end to ancillary jurisdiction, as well as to pendent party jurisdiction. *See* Charles A. Wright, Arthur R. Miller, Edward H. Cooper, 13A, 13B *Federal Practice and Procedure 2d,* §§ 3523, 3567.2 (1993 Pocket Part).

 The Court's holding, however, offered an invitation. The Court stated: "whatever we say regarding the scope of jurisdiction can of course be changed by Congress." *Finley,* 490 U.S. at 556, 109 S.Ct. at 2010. Congress responded the following year with the enactment of 28 U.S.C. § 1367, which codified the doctrines of ancillary and pendent jurisdiction as they existed prior to *Finley.* Section 1367 labeled these doctrines "supplemental jurisdiction." The principal purpose of the statute was to make clear that in federal question cases pendent party jurisdiction is permissible. *Federal Practice and Procedure 2d* at § 3567.2.

The supplemental jurisdiction statute fails, however, to answer the jurisdictional question raised by the FDIC. The statute by its terms applies "to civil actions commenced on or after December 1, 1990, the date of the enactment of this Act." Pub.L. 101–650, Title III, § 310(a), Dec. 1, 1990, 104 Stat. 5113. As a result, since this case was filed July 25, 1990, the new supplemental jurisdiction statute does not apply to this action. The instant case arose in the brief post-*Finley,* pre-"supplemental jurisdiction" era.

 As it turns out, resolution of the issue presented by *Finley* is unnecessary at this time. This is because of the conclusion we reach below on the effect of the prior settlement by the FirstSouth directors. In the second part of this Order, the Court rules that Deloitte is barred from seeking contribution from the settling directors. *See* discussion below. Whether the Court has or does not have jurisdiction over claims by Deloitte against the FirstSouth directors, it certainly has jurisdiction over the allocation of liability to Deloitte for any damage caused by its audits. Deloitte, after all, is the defendant in this federal question case. *See* 12 U.S.C.A. § 1819(b)(2)(A) (West 1989). Further, under a claim reduction or proportionate fault rule, this court does not need jurisdiction over the settling directors to determine the proportion of fault, if any, attributable to Deloitte as a joint tortfeasor even though that determination necessarily involves inquiry into the degree of fault attributable to the settling directors.

Thus, at this juncture in the case, the "jurisdictional problem" may be by-passed.

## II. *Effect of settlement on Deloitte, the nonsettling defendant*

 The effect of a plaintiff's settlement with one or more joint tortfeasors and how it affects the rights and liability of plaintiffs and nonsettling defendants has resulted in several different approaches and considerable disagreement over which method is the best. The question has arisen in several contexts, including: (1) federal securities actions, (*See Singer v. Olympia Brewing Co.,*

878 F.2d 596, 600 (2d Cir.1989), *cert. denied,* 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 748 (1990)); (2) admiralty actions, (*See Associated Elec. Co-op, Inc. v. Mid–America Transp. Co.,* 931 F.2d 1266, 1269 (8th Cir.1991)); and (3) FDIC actions, (*See FDIC v. Geldermann, Inc.,* 763 F.Supp. 524 (W.D.OK 1990), *rev'd on other grounds,* 975 F.2d 695 (10th Cir. 1992)). While there is considerable debate over the proper judicial selection of a contribution rule in all of the above contexts, courts have consistently recognized that the choice of a contribution rule is a matter of federal law, not state law. *See Associated Elec. Co-op,* 931 F.2d at 1269; *Singer,* 878 F.2d at 600; *Geldermann,* 763 F.Supp. at 528. The Court agrees with the FDIC that federal law governs the adoption of a contribution rule. Thus, Arkansas law on this matter, despite Deloitte's position, will not be applied.

Potentially, there are several directions in which federal common law could evolve in regard to the effect of settlement on contribution among joint tortfeasors. In all of the above contexts, the policy considerations are substantially the same. As a result, before an analysis is made of which contribution rule should be applied, it will be helpful to review some general tort principles.

■ The threshold question in cases involving multiple defendants is whether the negligence of the plaintiff, if any, is to be compared to each defendant or against the total of all the defendants. The majority and better view is to compare the combined negligence of all defendants against the plaintiff's negligence. Henry Woods, *Comparative Fault* 2d ed. § 13.1 (1987). At common law, once the judgment was entered against joint tortfeasors, the liability was joint and several. This concept was not initially changed by the introduction of comparative negligence. Each tortfeasor whose negligence was a proximate cause of an indivisible injury remained individually liable for all compensable damages attributable to that injury. *Id.* at § 13.4 (citing Prosser, The Law of Torts, § 47 (4th ed. 1871)). The rule was potentially harsh for defendants, because, at common law, there was no contribution among joint tortfeasors. As a result, there have been judicial and statutory initiatives to avoid the consequences of the no contribution rule. One approach has been to eliminate joint and several liability—replacing that concept with an apportionment of individual liability on the basis of each joint tortfeasor's percentage of fault. While this method is particularly fair to individual defendants, since each defendant's liability is limited to the harm he or she caused, it subjects the plaintiff to the risk of each defendant's insolvency.

■ The second inroad on the no contribution rule has been the development of various contribution formulas. An apportionment of damages among joint tortfeasors on an equitable basis has developed as a result of the growth and acceptance of comparative negligence in tort law. In fact, in admiralty actions, the rule of "no contribution" is no longer viable. *Cooper Stevedoring Co. v. Fritz Kopke, Inc.,* 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974). "[A] 'more equal' distribution of justice can best be achieved by ameliorating the common-law rule against contribution which permits a plaintiff to force one of two wrongdoers to bear the entire loss, though the other may have been equally or more to blame." *Id.* at 110–111, 94 S.Ct. at 2177. The no contribution rule is equally inappropriate in this FDIC action.

At the other end of the spectrum from no contribution is the rule of full contribution. This alternative would permit a contribution claim by tortfeasor A against joint tortfeasor B notwithstanding the fact that tortfeasor B had settled with the plaintiff. Obviously, the full contribution approach has the distinct disadvantage of discouraging settlement. *See The Matter of the Oil Spill By the Amoco Cadiz,* 954 F.2d 1279, 1317 (7th Cir.1992). A defendant has little incentive to settle if, subsequent to his settlement, he can be held to additional liability in a contribution action by a nonsettling joint tortfeasor.

Once it is decided that neither a "no contribution" rule nor a "full contribution" rule will be followed, two additional questions must be answered. First, the Court must determine whether fault should be distributed proportionately or on an equal (pro-rata) basis among the joint tortfeasors. Second, the

Court must determine what effect a settlement and release by one tortfeasor has on the remaining tortfeasor.

■ In answer to the first question, the better rule is to distribute fault among tortfeasors on a proportionate fault basis rather than on an equal (pro-rata) basis. This is true even though the 1939 and 1955 versions of the Uniform Contribution Among Tortfeasors Act provided for pro-rata contribution. The equal (pro-rata) basis simply divides the total damages by the number of tortfeasors. As a result, the percentage of harm caused by each tortfeasor is not reflected in the distribution of liability among tortfeasors. Such an outcome is inequitable. The early resistance to proportionate contribution is most likely explained by the prevailing negative attitude throughout the first half of this century towards any system that smacked of comparative fault. The optional provision of the 1939 uniform Act, which permitted proportionate assessment of fault, has been uniformly approved by commentators and in recent years has received almost universal acceptance. Proportionate assessment of fault among defendants more accurately reflects the reality of wrongdoing. *See generally* Henry Woods, *Comparative Fault* 2d ed. § 13.4–7 (1987). Under an allocation system based upon relative fault, the more culpable tortfeasor will bear the greater share of the loss, but a less culpable joint tortfeasor will not escape all liability, as was the case under a no contribution system, and will not overpay as he would under an equal (pro-rata) contribution system.

■ A second question the Court must ask is whether a settlement by one tortfeasor has any effect on other joint tortfeasors. At common law, a recovery and satisfaction of a judgment against one tortfeasor discharged all the others. This rule was abrogated by the Uniform Act which stated that a release by one joint tortfeasor does not release the others unless it specifically so provides. The effect of a settlement is to release the *settling* defendant, but the effect on the plaintiff and the nonsettling defendants has remained an open and hotly debated question. The two most frequently suggested rules to apply when one tortfeasor has settled are the settlement bar rule (or pro tanto rule) and the claim reduction rule (or proportionate fault rule)." [2]

■ Under the settlement bar rule, assuming the settlement was made in good faith, the settling tortfeasor escapes any liability for contribution. Following settlement, the settling tortfeasor's involvement in the action ends. He is discharged. A nonsettling defendant is entitled to a credit for the dollar amount paid by the settlers. Thus, the plaintiff may recover the entire amount of the judgement from the nonsettling defendant, less the amount that the plaintiff had already collected from the settling tortfeasor. Under the settlement bar rule, defendants are encouraged to settle since settlement buys peace. Plaintiffs, likewise, will negotiate settlements since there is no disincentive from their perspective. A plaintiff risks nothing by settling since he or she may collect the full amount of the damage award regardless of whether the prior settlement reflected an accurate picture of the economic harm caused by the settling tortfeasor. To some extent, this resurrects some of the problems with the "no contribution" rule by allowing the plaintiff to pick and choose with whom to settle. This can result in an inequitable result when one defendant is forced to pay damages far in excess of the proportionate share of harm he or she caused. The

---

**2.** Just as there is no consensus on which rule to apply throughout the circuits, there is also no consensus on what terminology to use in describing the various contribution rules. Some courts use the term "settlement bar" generically to refer to a rule that bars a non-settling defendant from seeking contribution from a settling defendant; those courts then break down "settlement bar" into two alternative approaches—the "pro tanto" approach or the "proportionate fault" approach. Other courts use the term "settlement bar" or "contribution bar" more specifically to mean

what others call the pro tanto method. The proportionate fault approach is also known as "claim reduction" or simply as "comparative fault."

For clarity's sake, this Order will use the following verbiage: (1) "settlement bar" is used to refer to a specific approach to contribution, what some call the pro tanto rule, rather than generically, (2) "claim reduction" is used to refer to that method of contribution which is also known as the proportionate fault approach.

settlement bar rule encourages quick, partial settlements but potentially frustrates complete and just settlements. A plaintiff can receive some money initially by settling, all the while knowing that the remaining nonsettling tortfeasor will be responsible for the balance of any damage award. Such an environment creates the opportunity for improper deal-making and collusive settlements. For example, plaintiffs, knowing that the deep pocket defendant remained to pick up the tab, would be encouraged to settle, fairly or unfairly, primarily with the less affluent defendant. To a limited extent this problem can be overcome by requiring the settlement, which extinguishes the other defendants' right of contribution, to be subject to a good faith requirement. However, the monitoring and inquiry into good faith impose new burdens on the courts. Both from an administrative and practical standpoint it may be difficult to ensure that plaintiffs and settling parties will not scheme to put the onus unfairly on the remaining defendants. A mini-trial concerning the merits of the settlement will usually be required to determine whether the liability assumed by the settling tortfeasor is reasonably related to the strength of the plaintiff's claims. And there may be hidden, and difficult to ferret out, considerations in such settlement agreements which such bob-tailed "good faith" hearings are not likely to identify.

A second approach is what is referred to as the claim reduction rule (or proportionate fault rule). This rule, like the settlement bar rule, bars contribution from the settling tortfeasor. The claim reduction rule, however, adopts the comparative fault approach in that it restricts the plaintiff's recovery against the nonsettling tortfeasor to that defendant's proportionate share of fault. Under this rule, the plaintiff forgoes the right to collect from nonsettling defendants any damages attributable to the settling party's share of fault. In other words, the trier of fact must decide the relative fault of each joint tortfeasor, including those who have settled, and the damage award then is reduced by the proportion of fault attributed to the settling tortfeasors. The plaintiff's total recovery consists of the amount he or she received from the settling tortfeasor plus the amount represented by the nonsettling tortfeasor's proportionate share of fault.

One criticism often levied against the claim reduction rule is that the plaintiff, by settling with one defendant, may receive less than the full compensation awarded in a final judgment since his recovery from the nonsettling defendants is reduced by the settling defendant's share of fault. That criticism only expresses one side of the equation, however. If the plaintiff recovers more money in settlement than is represented by the settler's percentage of fault as found by the jury, he has made a favorable settlement; if less, a bad settlement. If the plaintiff recovers more from the settling tortfeasor and the nonsettling tortfeasor than is represented by the judgment, it can be argued that such an outcome runs afoul of the one satisfaction rule. However, the defendant before the court never pays more than the judgment which reflects in dollars the damages occasioned by his or her proportionate share of fault. Any risk of overpayment is borne by the settling defendant, as it should be since he is estimating an uncertainty when he settles. Since a settlement is an agreement reached between a plaintiff and defendant concerning the amount of money owed by the defendant to the plaintiff for the harm that he has caused, it is obvious that the parties may overestimate or underestimate the value of the plaintiff's claim. Such an agreement naturally involves the tradeoff of a certain recovery in exchange for the relinquishment of a possibly more lucrative recovery at trial. Both parties must analyze the risk/return ratio of going to trial. When the plaintiff voluntarily chooses to settle, limiting the remaining nonsettling tortfeasors' liability to an amount commensurate with the degree of fault of each does not unduly burden the plaintiff. More importantly, it results in the fair and just disposition of the plaintiff's claims against the nonsettling joint tortfeasors. And it avoids the slippery "good faith" analysis required by the settlement bar approach. As stated by the Eighth Circuit in *Associated Electric Co-op v. Mid–America Transp.*, 931 F.2d 1266 (8th Cir.1991):

Unlike the contribution bar approach, the proportional fault approach deters collu-

sive settlements by limiting the plaintiff's recovery against non-settling defendants to a sum accurately reflecting such defendants' negligence. Unlike AEC's preferred approach allowing contribution suits, the proportional fault approach does not discourage defendants from settling by subjecting them to the risk of the contribution suits from non-settling defendants. Admittedly, the proportional fault approach creates some risk that plaintiffs might either receive double recovery from a generous settlement or be deterred from settling because a plaintiff's settlement could be offset by a reduction at trial of his or her recovery. *See Leger* [*v. Drilling Well Control, Inc.*], 592 F.2d [1246] at 1248–50 [5th Cir.1979] (rejecting non-settling defendant's concerns about double recovery); Restatement § 886A comment m (expressing concern that proportional fault approach might deter settlement). Because some settlements are more favorable than others, we believe these risks balance each other out. *Cf. Leger*, 592 F.2d at 1250 n. 10 (noting that "[s]ettlement dollars may be worth more or less than judgment dollars, depending on which party received the more favorable settlement.") In sum, we hold that when the Teasleys' claims against AEC come to trial, the court should reduce "the claim that the injured party [Teasley] has against the other tortfeasors [AEC] by the amount of the equitable share of the obligation of the released tortfeasor [MATCO]."

Further, the one satisfaction rule concern expressed by the Tenth Circuit in *U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1236 (10th Cir.1988), need not be offended by the claim reduction rule. Modification of the rule is easily accounted for when giving credit for the prior settlement. Instead of the nonsettling defendant receiving credit for the settler's proportionate share of fault, he or she could receive credit for the settler's proportionate share of fault or the dollar amount of the settlement, whichever is greater. Such a modification would prevent over compensation to the plaintiff.

The Court recognizes that the FDIC's laudable mission is "[t]o put the Federal Deposit Insurance funds on a sound financial footing," FIRREA § 101, 103 Stat. 187; and that "preservation of the permanent insurance fund is vital to the continued health of the nation's banking system." *See FDIC v. Jenkins*, 888 F.2d 1537, 1541 (11th Cir.1989). The Court is also mindful that a uniform settlement bar rule should be adopted. *See Franklin v. Kaypro Corp.*, 884 F.2d 1222, 1230 (9th Cir.1989), *cert. denied*, 498 U.S. 890, 111 S.Ct. 232, 112 L.Ed.2d 192 (1990); *Singer v. Olympia Brewing Co.*, 878 F.2d 596, 599 (2nd Cir.1989), *cert. denied*, 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 748 (1990). However, making the FDIC whole does not overshadow the goal of equitable apportionment of loss among responsible defendants. There is enough blame for the nationwide failure of the savings and loan industry to pass around among the directors and officers of the institutions, to Congress for its ill-conceived deregulation plan, to the FSLIC and FHLBB for their bank examinations, to the brokerage industry for pumping the S & L's full of high rate certificate of deposit money, and possibly also to the accounting and legal firms that provided professional services; without compounding the problems by allocating a disproportionate share of the damage responsibility to the defendant in this case.

■ To apply the settlement bar rule on these particular facts strikes the Court as fundamentally unfair. The FDIC's predecessor, FSLIC, sued the Directors of the failed savings and loan in 1986 for at least $150 million [3] and settled three years later for $6.7 million. Almost a year later in 1990, the FDIC filed suit in the instant case against Deloitte seeking "damages in excess of $400 million." Application of the settlement bar rule in this case would unfairly shift the risk

---

**3.** Although the FSLIC's First Amended Complaint against the directors just prayed for "the amount of FirstSouth's damages," a phrase in the Complaint alleged that "[b]y reason of these imprudent and unsafe transactions, FirstSouth was damaged in an amount in excess of $150 million." FSLIC's First Amended Complaint at 12, Exhibit A of Exhibits Cited in Deloitte's Brief in Support of Motion filed 9/18/92.

of an inadequate or imprudent settlement to Deloitte, who as a non-party had neither the opportunity nor the incentive to challenge the settlement. Further, while it is within the province of the jury to allocate fault, it strikes the Court that the fault differential between the directors of the failed savings and loan and Deloitte may be on completely different planes. Yet, conceivably under a settlement bar approach, Deloitte could get stuck for a tab of $393.3 million regardless of how much fault is actually assignable to Deloitte. Basic notions of fairness prohibit such a result. The Court is not unmindful of the goal of our tort system to make injured plaintiffs whole. However, the Court cannot ignore the fact that the FDIC's predecessor, the FSLIC, voluntarily elected to settle with the directors for what appears to be a fraction of their claimed damages. It simply is unconscionable on the facts of this case to leave Deloitte holding the bag for the millions of claimed damages, a result which might bear no relation to the degree of their own fault. Accordingly, the Court adopts the claim reduction rule as the approach which will resolve this case in the most just and fair manner.

IT IS THEREFORE ORDERED that Deloitte's motion[4] to bar contribution claims and to apply provisions of Arkansas law be, and it is hereby, GRANTED in part and DENIED in part. Deloitte's motion[5] for extension of time to file a third party complaint is hereby rendered MOOT.

IT IS SO ORDERED.

---

4. Docket no. 89.

5. Docket no. 140.