2012 Ark. 461

**PROASSURANCE INDEMNITY COMPANY, INC., f/k/a The Medical Assurance Company, Inc., Appellant/Cross–Appellee**

v.

**Pamela and Kenny METHENY, Individually and as Co–Conservators of Cody Ryan Metheny, Appellees/Cross–Appellants.**

No. 11–823.

Supreme Court of Arkansas.

Dec. 13, 2012.

Brown & James, P.C., by: David P. Ellington; and Friday, Eldredge & Clark, L.L.P., by: William M. Griffin III, J. Adam Wells, Little Rock, Jason B. Hendren, Rogers, for appellant.

The Duncan Firm, Little Rock, by: Phillip J. Duncan; Davis, Bethune & Jones, by: Grant L. Davis, and Thomas C. Jones; and Brian G. Brooks, Attorney at Law, PLLC, by: Brian G. Brooks, for appellee.

DONALD L. CORBIN, Justice.

This is an appeal from a jury verdict in favor of Appellees Pamela and Kenny Metheny, individually and as co-conservators of Cody Ryan Metheny, in a medical-negligence case. Appellant ProAssurance Indemnity Company, Inc., f/k/a The Medical Assurance Company, Inc., is the liability-insurance company for Arkansas Children's Hospital (ACH), a not-for-profit corporation. On appeal, ProAssurance argues that the circuit court erred (1) in failing to instruct the jury in a manner that would allow it to apportion liability among it and certain physicians who were sued in a prior case but ultimately settled; (2) in refusing to allow ProAssurance to present evidence of fault attributable to the settling physicians; and (3) in denying ProAssurance's motion for judgment notwithstanding the verdict (JNOV) where the evidence supporting Cody's future damages was based on improperly bundled calculations. The Methenys cross-appeal the circuit court's order reducing the jury's verdict from $20 million to $11 million. Our jurisdiction of this case is pursuant to Ark. Sup.Ct. R. 1–2(b)(4) (2012), as the appeal involves issues of substantial public interest. We find no error and affirm on both direct appeal and cross-appeal.

The facts are these. Cody Metheny, who was then fifteen years old, was scheduled to undergo elective brain surgery on the right side of his brain at ACH on August 2, 2004. The surgery, to excise a right-temporal-lobe lesion, was aimed at eliminating epileptic seizures occurring on the right side of Cody's brain. This procedure, formally known as a selective amygdala hippocampectomy (SAH), was scheduled to last approximately four hours and was to be performed by Dr. Badih Adada, a physician employed by the University of Arkansas for Medical Sciences (UAMS), who also practiced at ACH.[1]

Prior to the surgery, ACH invited a reporter for the Arkansas Democrat–Gazette, Nell Smith, to observe the surgery and take photographs of the surgical procedure. Pam Metheny was approached by a member of ACH's public-relations department and asked to a sign a medical-authorization form on Cody's behalf for the release of photographs taken during his surgery. The surgery began with Dr. Adada making an incision on the left side of Cody's brain. According to the Methenys' complaint, Dr. Adada then penetrated and opened the dura, and the surgical team removed and damaged significant

---

1. ACH is a clinical and teaching affiliate of UAMS, per an affiliation agreement entered into between the two hospitals in January 1982.

portions of the left amygdala, parts of the hippocampus, and other left-hemisphere brain tissue. Once Dr. Adada realized that he had operated on the wrong side of Cody's brain, he asked the media representatives to leave the operating room. Cody was then repositioned, and Dr. Adada began operating on the right hemisphere of Cody's brain, without letting his family know that he had just operated on the left side of his brain.

Following the surgery, Dr. Adada spoke with the family and told them that he had started the surgery on the wrong side, that no harm had been done to the left side of the brain, and that he was able to successfully remove the right-side lesion. It is undisputed that hospital administrators were made aware of the fact that Dr. Adada began the procedure on the wrong side of the brain. But, according to Dr. Jonathan Bates, CEO of ACH, he was not informed by Dr. Adada or anyone else that the surgery went beyond the dura or that any harm had been done beyond that.

After the surgery, Cody spent approximately six days in the hospital before he was discharged home. He returned to school in September, where he served as manager of the football team and the fire-monitor captain. Cody graduated from Parkview High in 2007. But, according to his father, Kenny Metheny, Cody was not the same after the surgery. Mr. Metheny stated that Cody was unable to express emotion, even after the death of his grandmother. He also stated that Cody no longer gets excited and that he has a blank and void look in his eyes. Cody was ulti-mately referred to a residential facility known as the NeuroRehab Living Center in Virginia Beach, Virginia, where he was residing at the time of trial.

It was not until some fifteen months after the surgery that the Methenys learned that tissue had been removed from the left hemisphere of Cody's brain. Thereafter, on January 6, 2009, the Methenys, individually and as co-conservators of Cody, filed a direct-action suit, alleging medical negligence on the part of ACH, against the hospital's liability-insurance carrier, ProAssurance.[2] In their complaint, the Methenys asserted that ACH, by and through its administration, employees, department heads, and agents committed multiple acts of administrative and medical negligence, both before, during, and after the two brain surgeries performed on August 2, 2004. The Methenys alleged that administration officials failed to take any action to stop the surgery on the right side of the brain after learning of the mistaken surgery on the left side of the brain. More specifically, the Methenys alleged that ACH's surgical team removed and destroyed critical brain tissue from both sides of Cody's brain and, despite having knowledge of the two surgeries, never disclosed this information to the Methenys.[3] According to the complaint, the fact that ACH's administration failed to notify the family of the wrong-sided surgery deprived their son of critical rehabilitation time. The Methenys sought both compensatory and punitive damages

---

2. The Methenys originally filed a cause of action against ACH and its employees, ProAssurance, and Dr. Adada and the other UAMS physicians involved in the surgery. Shortly before trial, the Methenys settled their claim against Dr. Adada and released the other physicians. Then, during trial, the Methenys dismissed their claim against ProAssurance.

3. The surgical team is listed in the complaint as Dr. Badih Adada, Nurse Ellen Powell, Nurse Gary Cameron, Earnice McDaniel, Tameka Bryant, Jamie Curry, Nurse Ron Bruton, Nurse Shannon Williams, as well as all other ACH employees involved before or after the surgery.

based on two counts of medical negligence, as well as one count of outrage.

In its answer to the complaint, ProAssurance admitted that Dr. Adada removed tissue from both sides of Cody's brain during the surgery, but denied any wrongdoing on the part of ACH employees. ProAssurance, pleading affirmatively, stated that the complaint failed to state facts upon which relief could be granted for punitive damages and asked that such claims be dismissed. ProAssurance further asserted the affirmative defense that there was an intervening proximate cause that was the sole proximate cause of the injury to Cody. Finally, pleading affirmatively, ProAssurance asserted an entitlement to a setoff for the total amount paid in consideration of claims against other tortfeasorers in accordance with Ark.Code Ann. § 16–61–204 and an entitlement to request that the jury assign percentages of fault among all tortfeasors, whether parties or nonparties, pursuant to Ark.Code Ann. § 16–55–202.

The Methenys filed an amended complaint on March 6, 2009. Therein, the Methenys restated many of the allegations raised in the first complaint. They added, however, a cause of action for direct and vicarious general administrative negligence by ACH, as well as a claim of outrage against ProAssurance, separate and apart from the outrage claim related to ACH, alleging that ProAssurance advised ACH to not report this as a sentinel event and, thus, acted in concert with ACH to commit outrageous acts and omissions, including and/or directing the manner in which medical decisions were made for Cody in order to avoid or limit an insurance claim and/or in anticipation of litigation. The Methenys repeated their requests for both compensatory and punitive damages.

On June 18, 2009, ProAssurance filed a motion to dismiss the outrage claim raised against it in the amended complaint. ProAssurance argued that the only reason it was a party to the suit was as a result of its insurer-insured relationship with ACH, and that by adding the outrage claim, the Methenys were attempting to add a new claim and were not entitled to the benefit of the Arkansas Savings Statute. The circuit court subsequently dismissed the outrage claim against ProAssurance.

ProAssurance filed a motion for leave to file a third-party complaint on January 27, 2010. Therein, ProAssurance sought the circuit court's permission to file a third-party complaint against several doctors who were party-defendants in the prior filing of this action. This included Dr. Adada, who had previously settled with the Methenys. ProAssurance stated that because of the settlement, it was entitled to contribution, credit for settlement, setoff, and apportionment of fault, but it was unsure how to proceed and, thus, wanted to file the third-party complaints against the settling Dr. Adada and the other UAMS physicians who were also released.

The circuit court entered an order on May 28, 2010, granting ProAssurance's motion for leave to file the third-party complaint against the UAMS physicians. Thereafter, on June 4, 2010, ProAssurance filed a third-party complaint against Dr. Adada, Dr. James Crosland, Dr. Gregory Sharp, Dr. Ali Raja, and Dr. Scott Suhrer. Therein, ProAssurance stated that the third-party defendants were defendants in the original filing of this case but subsequently entered into a settlement agreement with the Methenys in exchange for being released from all liability in connection with the allegations in this case. ProAssurance further pled that the third-party complaint was necessary in order to avail itself of all rights of contribution, credit for settlement, setoff, and apportionment of fault. The UAMS doctors an-

swered, and pleading affirmatively, stated, among other things, that the third-party complaint was barred by the statute of limitations and was improper as they had been dismissed with prejudice from the original case.

The third-party defendants filed a joint motion to dismiss the third-party complaint on July 26, 2010. They asserted that the third-party complaint was barred by the doctrine of res judicata because of their prior settlement with the Methenys and release from further liability. They further argued that the third-party complaint should be barred pursuant to the doctrine of accord and satisfaction. Ultimately, at an August 30, 2010 hearing on the motion, the circuit court ruled from the bench that it was dismissing the third-party complaints. A written order of dismissal was then entered on September 14, 2010.

A jury trial was held on September 7–24, 2010, at which the following relevant testimony was adduced. Ellen Powell, a former ACH employee who was the circulating nurse in the operating room at the time of Cody's surgery, testified that prior to the surgery, a timeout occurred as required by ACH's Policies and Procedure AP 19. Powell stated that during the timeout, the procedure was not designated as a sided procedure; rather, all relevant paperwork listed it as a "craniotomy for SAH." Powell admitted that she did not know what an SAH was until after Cody's surgery. According to Powell, even if she had known that Dr. Adada was operating on the wrong side of the brain, she would have not been able to stop the surgery because he was the surgeon. Powell stated that once Dr. Adada realized his mistake, he instructed her to call out to the parents and inform them that everything was going okay, which she did. She also stated that she never noted in the intraoperative report that there had been a wrong-sided surgery because she simply wrote down what Dr. Adada instructed her to note.

According to Mary McDaniel, vice-president of patient-care services at ACH, a timeout is a procedure that is supposed to occur prior to a surgery as final verification of the correct procedure site. The team involved in the timeout would include the surgeon, anesthesiologist, a scrub nurse, and a circulator. She also stated that a nurse has three documents available to her prior to the timeout: the consent form, the preoperative history and physical, and the schedule of the procedure. But, McDaniel denied that it was a nurse's responsibility to record in detail that a wrong-sided surgery took place, because such responsibility belonged to the surgeon.

Judie Holleman, a nurse practitioner for neurosurgery, testified as an expert for the Methenys. According to Holleman, the circulating nurse should have known whether a seizure surgery was going to take place on the left or right side of the brain because it cannot be performed midline. According to HoUeman, the fact that the preoperative documents failed to identify whether the surgery was taking place on the left or right side did not meet the required standard of care. More specifically, HoUeman stated that she listened to Powell's testimony and that Powell's actions did not meet the standard of care because she failed to pursue information as to which side the surgery was to take place. She stated that it is a circulating nurse's duty to make sure a surgery does not take place on the wrong side of anything, particularly a patient's brain. She admitted that it was Dr. Adada who positioned Cody, shaved his head, and prepped the head for surgery, but then explained that that is why a timeout is

required after the patient has been positioned. Finally, Holleman opined that the failure to document the wrong-sided surgery affected Cody's subsequent care.

Cody testified via video that he was aware that the doctors had operated on the wrong side of his brain, although he had no recollection of the time he spent at ACH. He stated that after the surgery he noticed some numbness and pressure on the right side of his face and that he had problems controlling his vision. Cody also stated that he has had memory problems since the surgery, although they have improved some since his time in Virginia.

Dr. Adada, who was the chief of pediatric neurosurgery at ACH at the time of Cody's surgery, also testified via video deposition. Dr. Adada admitted that he started the procedure on the wrong side of the brain, but denied that he removed any part of the left amygdala, stating that he merely did a biopsy on the left side. Dr. Adada admitted that he was responsible for Cody's surgery and further acknowledged that he acted below the standard of care. He also stated that he did not expect the hospital or the nurses to understand what a selective amygdala hippocampectomy was. Dr. Adada further admitted that he failed to do a complete, consistent, and accurate charting of Cody's history and physical. Dr. Adada explained that an ACH sentinel event is an unexpected occurrence involving death or serious physical or psychological injury or risk thereof, and that there was no question that what happened with Cody was a sentinel event. But, Dr. Adada stated that the procedures that follow a sentinel event did not occur in this instance, including having a hospital administrator present during discussions with the family. According to Dr. Adada, he told other doctors and people around the hospital that he started the surgery on the wrong side, that no harm was done to

the brain, and that he then operated on the correct side. Finally, Dr. Adada could not recall whether a timeout occurred prior to Cody's surgery.

Following the presentation of evidence, the case was submitted to the jury, which found in favor of the Methenys and awarded damages of $20 million. Following a hearing on November 8, 2010, the circuit court ultimately reduced the jury verdict to $11 million, an amount consistent with ProAssurance's liability coverage for ACH. ProAssurance subsequently filed a motion for JNOV, which was denied after a hearing. ProAssurance filed a timely notice of appeal, and the Methenys filed a timely notice of cross-appeal.

As its first point on appeal, ProAssurance argues that the circuit court erred in refusing to instruct the jury to determine the Methenys' total damages and to apportion liability among ACH and the settling physicians. Specifically, ProAssurance asserts that, pursuant to the plain language of Ark.Code Ann. § 16–55–201 (Supp. 2011), a provision of the Civil Justice Reform Act of 2003 (CJRA), the court was required to calculate a verdict against ACH by reducing the total damages by the proportionate share of each tortfeasor. This is so, ProAssurance reasons, because the CJRA abolished joint liability in favor of several liability in order to limit a defendant's liability to that proportion of the total fault attributable to it. According to ProAssurance, the jury's verdict against ACH is fatally flawed because of the absence of adequate instructions that would have allowed the jury to properly apportion fault.

The Methenys counter that the circuit court did not abuse its discretion in refusing ProAssurance's proffered instructions and verdict forms. According to the Methenys, the circuit court properly instructed the jury that ProAssurance could

only be held liable for ACH's separate fault and could not be held liable for any nonparty. Moreover, the Methenys assert that the instructions, as given, properly limited the jury from allocating any liability of the UAMS physicians to ACH and, thus, comported with the mandates of section 16–55–201. Finally, the Methenys argue that ProAssurance incorrectly states that the appropriate standard of review is the de novo standard utilized in reviewing issues of statutory construction. According to the Methenys, the issue before the circuit court was how to instruct the jury and should be reviewed for an abuse of discretion.

First, we must address the issue of the appropriate standard of review. Here, the relevant question on appeal is whether the circuit court erred in refusing the instructions proffered by ProAssurance that dealt with allocation of fault. Although ProAssurance would have this court conduct a de novo review under the guise of interpreting section 16–55–201, no such interpretation is necessary where that section governs allocation of liability as to "each defendant." *See* Ark.Code Ann. § 16–55–201. There was only one defendant in this case, ProAssurance, and therefore section 16–55–201 is inapplicable. Accordingly, our standard of review is that which governs the giving of jury instructions. Under Arkansas law, a party is entitled to a jury instruction when it is a correct statement of the law and there is some basis in the evidence to support giving the instruction. *See Bedell v. Williams*, 2012 Ark. 75, 386 S.W.3d 493. We will not reverse a circuit court's refusal to give a proffered instruction unless there was an abuse of discretion. *See id.*

We turn now to the instructions in this case. The record reflects that the circuit court instructed the jury in relevant part as follows:

JURY INSTRUCTION NO. ____

Under Arkansas law, neither Dr. Badih Adada nor any of the other physicians in this case was employed by Arkansas Children's Hospital. Rather, Dr. Adada and the other physicians were employed by the University of Arkansas for Medical Sciences at the time of the occurrence at issue in this case. ProAssurance Indemnity Company, Inc.'s insurance policy does not cover the acts or omissions of Dr. Adada or any other physicians in this case. Therefore, you should not attribute any fault on the part of Dr. Adada or other physicians to Arkansas Children's Hospital.

The jury was further instructed:

JURY INSTRUCTION NO. ____

If you find in favor of Pam and Kenny Metheny on behalf of Cody Metheny and against ProAssurance Indemnity Company as the liability insurer for Arkansas Children's Hospital, you may only allocate to ProAssurance Indemnity Company the degree of fault attributable to the acts or omissions of Arkansas Children's Hospital.

Following the instructions, the case was submitted to the jury on interrogatories. The relevant interrogatories provided as follows:

*INTERROGATORY NO. 1:* Do you find from a preponderance of the evidence that there was negligence on the part of Arkansas Children's Hospital, which was a proximate cause of any damages to Cody Metheny?

ANSWER: _____ (Yes or No)

*INTERROGATORY NO. 2:* State the amount of any damages, if any, which you find from a preponderance of the evidence were sustained by the [sic] Cody Metheny as a result of the occur-

rence which is attributable to the negligence of Arkansas Children's Hospital.

ANSWER: $_____

AMI 201

ProAssurance maintained below, and now on appeal, that these instructions were insufficient to protect its right to allocation of liability, as set forth in section 16–55–201, once the interrogatories were submitted to the jury. At trial, ProAssurance proffered several instructions and interrogatories that it insisted were necessary for the jury to properly apportion liability among ACH and the UAMS physicians. The relevant interrogatories that ProAssurance proffered stated as follows:

### INTERROGATORY NO. 1

Do you find from a preponderance of the evidence that Nurse Ellen Powell, Scrub Technician Earnice McDaniel or members of the administration at Arkansas Children's Hospital were guilty

ANSWER: ELLEN Powell, Earnice McDaniel or administrators at Arkansas Children's Hospital

| | | |
|---|---|---|
| ELLEN Powell, Earnice McDaniel or administrators at Arkansas Children's Hospital | _____ | % |
| Dr. Badih Adada | _____ | % |
| Dr. Grady Crosland | _____ | % |
| Dr. Gregory Sharp | _____ | % |
| Dr. Ali Raja | _____ | % |
| Dr. Scott Suhrer | _____ | % |
| TOTAL | 100 | % |

of negligence that was a proximate cause of damages to Cody Metheny? CHECK ONLY ONE:

YES_____

NO_____

IF YOU ANSWERED "YES" TO INTERROGATORY NO. 2 [sic], PROCEED TO INTERROGATORY NO. 2.

IF YOU ANSWERED "NO" TO INTERROGATORY NO. 1, *STOP* AND INFORM THE BAILIFF THAT YOU HAVE REACHED A VERDICT.

### INTERROGATORY NO. 7

NOTE: ANSWER INTERROGATORY NO. 7 *ONLY* IF YOU ANSWERED "YES" TO INTERROGATORY NO. 1 ABOVE.

Using 100% to represent the total responsibility for the occurrence and any injuries or damages proximately caused by it, apportion the responsibility between the parties that you found to be liable above. For any party for whom you found no liability above, enter "0" below.

Thus, ProAssurance sought interrogatories that would have placed nonparties on the verdict form. We agree with the Methenys that there is nothing in section 16–55–201 that requires a circuit court to submit a jury instruction allowing allocation of liability to a nonparty. In fact, section 16–55–201 provides,

(a) In any action for personal injury, medical injury, property damage, or wrongful death, the liability of each de-

fendant for compensatory or punitive damages shall be several only and shall not be joint.

(b)(1) Each defendant shall be liable only for the amount of damages allocated to that defendant in direct proportion to that defendant's percentage of fault.

(2) A separate several judgment shall be rendered against that defendant for that amount.

(c)(1) To determine the amount of judgment to be entered against each defendant, the court shall multiply the total amount of damages recoverable by the plaintiff with regard to each defendant by the percentage of each defendant's fault.

(2) That amount shall be the maximum recoverable against that defendant.

Ark.Code Ann. § 16–55–201 (Repl.2011). As we previously stated, this statute plainly provides that liability is to be apportioned with regard to "each defendant."[4]

We are cognizant of Pro Assurance's argument that this court's decision in *Johnson v. Rockwell Automation, Inc.*, 2009 Ark. 241, 308 S.W.3d 135, created a substantive right with regard to allocation of liability. But, we do not interpret our holding in that case as broadly as ProAssurance does. In that case, this court was presented with a certified question regarding the validity of Ark.Code Ann. § 16–55–202 (Supp.2011), the statute governing nonparty fault. The petitioners argued that this provision was unconstitutional because, among other reasons, it violated the separation-of-powers clause found in article 4, section 2 of the Arkansas Constitution. This court struck down section 16–55–202 as unconstitutional:

[T]he nonparty-fault provision in the instant case conflicts with our "rules of pleading, practice and procedure." While respondents assert that the nonparty-fault provision should be upheld because it does not directly conflict with

our rules of procedure as the legislative requirements did in *Summerville* [*v. Thrower*, 369 Ark. 231, 253 S.W.3d 415 (2007),] and *Weidrick* [*v. Arnold*, 310 Ark. 138, 835 S.W.2d 843 (1992)], we take this opportunity to note that so long as a legislative provision dictates procedure, that provision need not directly conflict with our procedural rules to be unconstitutional. This is because rules regarding pleading, practice, and procedure are solely the responsibility of this court. See Ark. Const. amend. 80, § 3.

*Johnson*, 2009 Ark. 241, at 7, 308 S.W.3d at 141. We further explained in *Johnson*, that section 16–55–201 was substantive law, in that it defines the right of a party—the defendant. This is not the same as saying that section 16–55–201 vests a defendant, such as ProAssurance, with the substantive right of allocation of liability. Moreover, in *Johnson*, we specifically found the nonparty-fault provision to be unconstitutional. Yet, ProAssurance would have this court hold that the circuit court abused its discretion in rejecting proffered instructions that would have allowed ProAssurance to place the UAMS doctors, who were no longer parties to any action by the Methenys, on the verdict form for purposes of allocation of liability. This we will not do.

The fact that ProAssurance unsuccessfully sought to bring the settling defendants into this action via the third-party complaint, which was ultimately dismissed and not appealed from, does not alter our

---

4. ProAssurance also argues that the jury instructions were insufficient in this case because, even if we do not interpret section 16–55–201 to require an apportionment of fault, the release entered into between the Methenys and the settling doctors contemplated apportionment of liability between the settling defendants and ACH. Thus, according to ACH, under section 16–61–204, it had a substantive

right to have the $20 million verdict reduced to the greater of the $1 million paid under the settlement or the pro rata share of liability attributed to the UAMS physicians. This argument is simply without merit where ProAssurance was not a party to the settlement agreement and had no corresponding right of enforcement.

analysis. Likewise, ProAssurance's reliance on *Federal Deposit Insurance Corp. v. Deloitte & Touche,* 834 F.Supp. 1155 (E.D.Ark.1993), is unavailing. ProAssurance sets forth that case as an example of another court adopting a proportionate-fault rule that it deems similar to section 16–55–201, and that allows a court to consider proportion of fault over settling defendants, despite the fact that they were not parties to the action. It is immaterial to our analysis that the federal court proceeded in such a manner.[5]

The relevant question in this appeal is simply whether the circuit court abused its discretion in refusing to submit nonmodel jury instructions that would have required the jury to apportion liability to parties who were not defendants in this case. We simply cannot say that the circuit court abused its discretion in this regard. When instructions are requested that do not conform to AMI, they should be given only when the circuit court finds that the AMI instructions do not contain an essential instruction or do not accurately state the law applicable to the case. *Barnes v. Everett,* 351 Ark. 479, 95 S.W.3d 740 (2003). The model AMI instructions are to be used as a rule, and non-AMI instructions should be used only when an AMI instruction cannot be modified. *Id.* Furthermore, it is not error for the trial court to refuse a proffered jury instruction when the stated matter is correctly covered by other instructions. *Id.* Here, the circuit court properly instructed the jury not to attribute any fault of the UAMS physicians to ACH and to allocate the fault of ACH only to ProAssurance. The interrogatories then submitted allowed the jury to determine the damages that resulted

from the fault of ACH. We cannot say that the circuit court abused its discretion in refusing the nonmodel jury instructions proffered by ProAssurance. We therefore affirm on this point.

As its next point on appeal, ProAssurance asserts that the circuit court erred, even under the instructions given, in refusing to allow it to present evidence of fault attributable to the UAMS physicians. More specifically, ProAssurance argues that its proffer of the deposition testimony of Dr. Kimberly Bingaman, an expert retained by plaintiffs in connection with the prior trial of this matter, should have been allowed.

The Methenys counter that there was no error in this regard because any undue prejudice from allowing such testimony outweighed any probative value and that Arkansas law does not allow ProAssurance to use the testimony in the manner it desired. Alternatively, the Methenys assert that the record does not support ProAssurance's assertion that Dr. Bingaman could have testified about the doctors' breach of care and any such evidence was cumulative to other evidence already introduced.

It appears that we are precluded from addressing the merits of this argument, as we are unable to find in the record where ProAssurance moved to introduce the testimony into evidence and received an explicit ruling by the circuit court that such testimony was inadmissible. It is elementary that this court will not consider arguments that are not preserved for appellate review. *Advance Am. Serv. of Ark., Inc. v. McGinnis,* 375 Ark.

---

5. ProAssurance's reliance on *McCoy v. Augusta Fiberglass Coatings, Inc.,* 593 F.3d 737 (8th Cir.2010), is likewise unavailing. In fact, in addressing the issue of whether a federal district court erred in refusing to allow a jury to consider the fault of a nonparty, the Eighth Circuit held that the issue was moot in light of this court's holding in *Johnson,* 2009 Ark. 241, 308 S.W.3d 135, that the nonparty-fault provision of the CJRA was unconstitutional.

24, 289 S.W.3d 37 (2008). It is incumbent upon the parties to raise arguments initially to the circuit court in order to give that court an opportunity to consider them. *Id.* Otherwise, we would be placed in the position of possibly reversing a circuit court for reasons not addressed by that court. *Id.*

The record reflects that prior to trial, the Methenys filed a motion in limine seeking to prohibit ProAssurance from using any of the Methenys' previously retained experts to testify regarding any breach of the standard of care by the UAMS physicians. This issue was then addressed at the August 30, 2010 pretrial hearing, and ProAssurance initially indicated that it did not intend to use the depositions of any of plaintiffs' non-testifying experts. Then following a discussion on the issue, wherein Dr. Bingaman was never specifically referenced, the circuit court stated that it would reserve any ruling on such evidence until that time when a party sought to introduce it. Then, on September 15, 2010, during trial, ProAssurance filed a "Supplemental Response to Plaintiffs' Motion in Limine Regarding Use of Plaintiffs' Non-testifying Experts." In its supplemental response, ProAssurance stated that it had made clear at the August 30, 2010 hearing that it intended to use the deposition of certain plaintiffs' experts, including Dr. Kimberly Bingaman, and believed the matter to be resolved, until later when the Methenys objected to the use of Bingaman's deposition testimony. But, we are unable to find in the record where ProAssurance sought and was denied the opportunity to introduce the testimony. In fact, the only mention of Dr. Bingaman's testimony regarding the breach of care by Dr. Adada is found at the conclusion of the trial when counsel and the circuit court were discussing jury instructions and proffers. At that time, counsel for ProAssurance stated in relevant part:

[I]t's been the Court's ruling that the fault of—that the fault of the other doctors, we're not going to put on proof of the fault of the other doctors. We believe that we've been prejudiced in that regard because we believe the jury could have put more fault on those doctors.

Counsel then proffered the deposition testimony of Dr. Bingaman, and the following colloquy took place between counsel for ProAssurance and the circuit court:

MR. GRIFFIN: And we are rejected on that, correct?

THE COURT: Yes.

MR. GRIFFIN: Over-ruled or whatever you—

THE COURT: Yeah, your proffer is accepted.

MR. GRIFFIN: My proffer is accepted, but we would not be allowed to present that testimony, correct?

THE COURT: That's correct.

In arguing that it was error for the circuit court to exclude Dr. Bingaman's testimony, ProAssurance points to this part of the record where the proffer was made and accepted, which indicates that the circuit court previously ruled on the issue. Again, however, we can find nowhere in the record where ProAssurance ever attempted to introduce such testimony and where the circuit court ruled that it was inadmissible. The proffer discussion is simply not enough to allow this court's review of the alleged error. We have explained,

Appellant's proffer ... does not offer any insight into the specific grounds for Appellant's objection. The lack of specific grounds for the objection coupled with the lack of an express ruling indicates to us that the trial court was not presented with the "lack-of-evidence" argument that Appellant now raises on appeal.

*Bell v. Misenheimer*, 2009 Ark. 222, at 4, 308 S.W.3d 120, 122. Although *Bell* involved an untimely objection to jury instructions, the aforementioned language is applicable here. ProAssurance now argues to this court that the circuit court erred in excluding this testimony, but we do not have a record that demonstrates which arguments were made to the circuit court as to why the testimony should or should not have been admitted. In *Allstate Insurance Co. v. Dodson*, 2011 Ark. 19, 376 S.W.3d 414, this court held that it is the duty of the appealing party to present a record from which this court can determine that an error occurred. Because we do not have such a record in this instance, we are precluded from reaching the merits of this point on appeal.

As its final point on appeal, ProAssurance argues that the circuit court erred in denying its motion for JNOV where the only evidence entered on future medical damages impermissibly bundled Cody's future expenses with costs to his family to visit him in the residential facility, despite his family not being proper parties to this litigation. According to ProAssurance, this problem was exacerbated when the Methenys' expert economist reduced the future damages to present value, thus, making it impossible for the jury to account for a reduction in the amount equal to the irrecoverable travel expenses.

The Methenys counter that the circuit court properly denied the motion for JNOV because ProAssurance failed to object to the testimony regarding bundled expenses and that, alternatively, it was not improper for the life-care nurse to bundle such expenses.

At trial, Jan Klosterman, a nurse who develops life-care plans, testified that in developing Cody's life plan with regard to future damages, one of the things she considered was the cost of residential care for Cody. In making that determination, Klosterman explained that she first identified the locations of the services and got the daily rates for those programs. She then explained that for the purpose of calculation, she "bundled a little bit of future therapy and the travel expenses because these were unique to each location of service." The Methenys also presented testimony from Dr. Bernard Pettingill, an economist retained by them, that he relied on the numbers presented by Klosterman to determine Cody's future damages. In reviewing the testimony of both Klosterman and Pettingill, the record reveals that the testimony about the bundling of costs was elicited at trial without any objection by ProAssurance. In fact, ProAssurance did not object to the evidence until it moved for a directed verdict at the close of the Methenys' case, where it then made the following general argument:

> The problem with the cost bundles. . . . They, nonetheless, left all those damages bundled together, the parts that are recoverable and the parts that are not recoverable, and all those were put together for Mr. Pettingill to do his calculations. Therefore, his calculations involved damages that are not recoverable in this case. The jury would have to speculate to try to separate the irrecoverable damages from those that are recoverable and that is not proper.

It is well settled that to preserve a point for appeal, a proper objection must be asserted at the first opportunity. *Travis Lumber Co. v. Deichman*, 2009 Ark. 299, 319 S.W.3d 239. No such objection was raised at the first opportunity and we therefore decline to review the merits of this argument on appeal.

We turn to the cross-appeal. The Methenys assert on cross-appeal that it was error for the circuit court to reduce

the jury's verdict in their favor from $20 million to $11 million because the applicable insurance policies provided more in coverage than the jury's $20 million award. Alternatively, the Methenys assert that this court should at least remand the matter to allow further discovery as to ProAssurance's applicable policy limits.

|23ProAssurance counters that the Methenys seek to improperly enlarge the available policy limits by claiming multiple contributing causes to Cody's injuries that occurred over multiple periods of time, when, in fact, Cody's injuries stem from the same medical incident, namely the surgery on his brain, and thus his injuries qualify as the same medical incident under the terms of the policy. Likewise, ProAssurance asserts that the Methenys may not avail themselves of the policy's $3 million aggregate limit on the basis that they brought this action against multiple nurses and administrative personnel because the policy specifically limits liability to $1 million per medical incident, regardless of the number of insureds. Thus, according to ProAssurance, where the policy has a $1 million limit, combined with the umbrella policy, which clearly states that it has a $10 million maximum-liability limit, it was appropriate for the circuit court to reduce the jury's verdict to the amount provided for under these two policies. We review this issue de novo. *E.g., Carr v. Nance*, 2010 Ark. 497, 370 S.W.3d 826.

The insuring agreement in the Primary Policy for Professional Liability Coverage provides in relevant part:

Coverage D: Health Care Facility Professional Liability Coverage

1. Insuring Agreement

We will pay on behalf of an insured all sums which the insured shall become legally obligated to pay as damages because of [an] injury arising from any medical incident which occurs after the retroactive date, and which is first reported during the policy period or any extended reporting period which may apply.

We have the right and duty to defend any suit against an insured seeking damages to which this insurance applies, even if any of the allegations of the suit are groundless, |24false or fraudulent; to select defense counsel; to make investigation of any medical incident that we deem expedient; and to settle any claim or suit that may result. We shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of our liability has been exhausted.

No other obligation or liability to pay sums or perform acts of services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS— COVERAGES D, E, AND F.

"Medical incident" is defined as

any act or omission in the furnishing of professional health care services, occurring at or from a scheduled facility.... Any such act or omission, together with all related acts or omissions in the furnishing of professional health care services to any one person shall be considered one medical incident. For purposes of this definition ... a continuing course of treatment or repeated exposure to substantially the same conditions constitutes a single medical incident.

Further, section III of the policy sets forth the limits of liability and specifically provides that the limits of liability "fix the most we will pay regardless of the number of: (a) insureds."

In support of their argument, the Methenys assert that ProAssurance provided a series of "primary" policies and "umbrella" policies from periods ranging from June 30, 2003 to June 30, 2004; June 30, 2004 to

June 30, 2005; and a third policy that began June 30, 2005. The surgery here took place during the second coverage period, on August 2, 2004. According to the Methenys, the first policy period is triggered because during that time, ACH failed to properly train staff on the timeout procedures. Next, they assert that because there were multiple claims and multiple "medical incidents," the primary and umbrella policies for that second policy period provided more in coverage than the $20 million jury verdict. Moreover, they assert that ACH's failure to inform Cody or his parents of the wrong-sided surgery spanned the second and third policy periods. Thus, the Methenys argue that where, as here, there were six separate medical incidents, the policies should have provided more coverage.

We agree with ProAssurance that there is one single medical incident, the surgery on Cody's brain, that resulted in his damages. We cannot say that the definition of medical incident, which provides in relevant part that a medical incident includes a continuing course of treatment, is ambiguous such that it should not be enforced. The language in an insurance policy is to be construed in its plain, ordinary, and popular sense. *Philadelphia Indem. Ins. Co. v. Austin,* 2011 Ark. 283, 383 S.W.3d 815. If the language is unambiguous, this court will give effect to the plain language of the policy without resorting to the rules of construction. *Id.* "In considering the phraseology of an insurance policy the common usage of terms should prevail when interpretation is required." *Id.* at 6–7, 383 S.W.3d at 820 (quoting *Cont'l Cas. Co. v. Davidson,* 250 Ark. 35, 42, 463 S.W.2d 652, 655 (1971)).

Likewise, the Methenys may not attempt to increase the available policy limits by now arguing that there were multiple insureds or multiple time periods involved. The Methenys sued ACH, and not any individual employees. Moreover, even had the Methenys sued multiple employees, the policy here specifically limits liability regardless of the number of insureds. *See Home Ins. Co. v. Aetna Ins. Co.,* 236 F.3d 927 (8th Cir.2001) (upholding a policy provision that limited liability regardless of the number of insureds).

The direct-action statute which allowed the suit directly against ProAssurance provides in relevant part that

[t]he insurer shall be directly liable to the injured person, firm, or corporation for damages to the extent of the coverage in the liability insurance policy, and the plaintiff may proceed directly against the insurer regardless of the fact that the actual tortfeasor may not be sued under the laws of the state.

Ark.Code Ann. § 23–79–210(a)(3) (Supp. 2011). Considering the language of the policy and this statute, which limits liability to the extent of coverage in the policy, we cannot say that the circuit court erred in reducing the jury's verdict to $11 million.

Affirmed on direct appeal; affirmed on cross-appeal.

BROWN, J., concurs.

ROBERT L. BROWN, Justice, concurring.

I agree with the majority opinion in every respect but one and that concerns whether ProAssurance preserved an objection to the disallowance of the use of Dr. Kim Bingaman's deposition. A look at the procedure in this case convinces me that the issue was preserved.

Dr. Bingaman was initially the Methenys' expert witness regarding physician liability. She was deposed, but the Methenys decided not to call her as a witness or

use her testimony in the ensuing trial against ProAssurance, the insurance carrier for Arkansas Childrens' Hospital. The Methenys filed a motion in limine to prevent ProAssurance from using the depositions of its non-testifying experts at trial to establish the liability of the physicians and not Arkansas Childrens' Hospital.

ProAssurance responded to the motion and stated that it would not use the depositions of non-testifying experts but that it expected Dr. Bingaman to testify and be subject to cross-examination.[27] Dr. Bingaman was not called as a witness at trial, and ProAssurance sought to use her deposition as part of its defense.

When part of Dr. Bingaman's deposition was proffered to the trial court during the defense case, defense counsel said, "My proffer is accepted, but we would not be allowed to present that testimony, correct?" The trial court responded, "That's correct." To me this was a rejection of ProAssurance's efforts to use part of Dr. Bingaman's deposition in its defense. Accordingly, I disagree with the majority on this point.

Having said that, I question whether the trial court was not correct in its ruling. Use of a deposition of an expert witness taken by an opposing party may be used to establish the standard of care in certain instances, but I question that the circumstances in the instant case qualify. Initially, this court has held that a party need not be placed in the position of explaining why it is not calling a deposed witness at trial. *See Western Sizzlin Corp. v. Parks Land Co., LLLP*, 2009 Ark. 277, 309 S.W.3d 193. In the instant case, it appears that the Methenys would be placed in that position. As a second matter, Dr. Adada, the leading neurosurgeon, forthrightly testified at trial that he was negligent. As a consequence, it would seem that Dr. Bingaman's testimony to that ef-

fect would be cumulative. Accordingly, the prejudice from disallowing part of this deposition into evidence would be nonexistent. For that reason, I concur in the result reached by the majority.